# BAILEY *v.* UNITED STATES

No. 94–7448.   Argued October 30, 1995—Decided December 6, 1995*

---

*Together with No. 94–7492, *Robinson* v. *United States,* also on certiorari to the same court.

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Alan E. Untereiner* argued the cause for petitioners in both cases. With him on the briefs were *David B. Smith* and *Roy T. Englert, Jr.*

*Deputy Solicitor General Dreeben* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Days, Assistant Attorney General Harris, James A. Feldman,* and *John F. De Pue.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

These consolidated petitions each challenge a conviction under 18 U. S. C. § 924(c)(1). In relevant part, that section imposes a 5-year minimum term of imprisonment upon a person who "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." We are asked to decide whether evidence of the proximity and accessibility of a firearm to drugs or drug proceeds is alone

---

†*Edward H. Sisson* and *Daniel A. Rezneck* filed a brief for James Doe as *amicus curiae* urging reversal.

sufficient to support a conviction for "use" of a firearm during and in relation to a drug trafficking offense under 18 U. S. C. § 924(c)(1).

I

In May 1989, petitioner Roland Bailey was stopped by police officers after they noticed that his car lacked a front license plate and an inspection sticker. When Bailey failed to produce a driver's license, the officers ordered him out of the car. As he stepped out, the officers saw Bailey push something between the seat and the front console. A search of the passenger compartment revealed one round of ammunition and 27 plastic bags containing a total of 30 grams of cocaine. After arresting Bailey, the officers searched the trunk of his car where they found, among a number of items, a large amount of cash and a bag containing a loaded 9-mm. pistol.

Bailey was charged on several counts, including using and carrying a firearm in violation of 18 U. S. C. § 924(c)(1). A prosecution expert testified at trial that drug dealers frequently carry a firearm to protect their drugs and money as well as themselves. Bailey was convicted by the jury on all charges, and his sentence included a consecutive 60-month term of imprisonment on the § 924(c)(1) conviction.

The Court of Appeals for the District of Columbia Circuit rejected Bailey's claim that the evidence was insufficient to support his conviction under § 924(c)(1). *United States* v. *Bailey*, 995 F. 2d 1113 (CADC 1993). The court held that Bailey could be convicted for "using" a firearm during and in relation to a drug trafficking crime if the jury could reasonably infer that the gun facilitated Bailey's commission of a drug offense. *Id.*, at 1119. In Bailey's case, the court explained, the trier of fact could reasonably infer that Bailey had used the gun in the trunk to protect his drugs and drug proceeds and to facilitate sales. Judge Douglas H. Ginsburg, dissenting in part, argued that prior Circuit precedent required reversal of Bailey's conviction.

In June 1991, an undercover officer made a controlled buy of crack cocaine from petitioner Candisha Robinson. The officer observed Robinson retrieve the drugs from the bedroom of her one-bedroom apartment. After a second controlled buy, the police executed a search warrant of the apartment. Inside a locked trunk in the bedroom closet, the police found, among other things, an unloaded, holstered .22-caliber Derringer, papers and a tax return belonging to Robinson, 10.88 grams of crack cocaine, and a marked $20 bill from the first controlled buy.

Robinson was indicted on a number of counts, including using or carrying a firearm in violation of § 924(c)(1). A prosecution expert testified that the Derringer was a "second gun," i. e., a type of gun a drug dealer might hide on his or her person for use until reaching a "real gun." The expert also testified that drug dealers generally use guns to protect themselves from other dealers, the police, and their own employees. Robinson was convicted on all counts, including the § 924(c)(1) count, for which she received a 60-month term of imprisonment. The District Court denied Robinson's motion for a judgment of acquittal with respect to the "using or carrying" conviction and ruled that the evidence was sufficient to establish a violation of § 924(c)(1).

A divided panel of the Court of Appeals reversed Robinson's conviction on the § 924(c)(1) count. *United States* v. *Robinson*, 997 F. 2d 884 (CADC 1993). The court determined, "[g]iven the way section 924(c)(1) is drafted, even if an individual intends to use a firearm in connection with a drug trafficking offense, the conduct of that individual is not reached by the statute unless the individual actually uses the firearm for that purpose." *Id.*, at 887. The court held that Robinson's possession of an unloaded .22-caliber Derringer in a locked trunk in a bedroom closet fell significantly short of the type of evidence the court had previously held necessary to establish actual use under § 924(c)(1). The mere proximity of the gun to the drugs was held insufficient to

support the conviction. Judge Henderson dissented, arguing, among other things, that the firearm facilitated Robinson's distribution of drugs because it protected Robinson and the drugs during sales.

In order to resolve the apparent inconsistencies in its decisions applying § 924(c)(1), the Court of Appeals for the District of Columbia Circuit consolidated the two cases and reheard them en banc. In a divided opinion, a majority of the court held that the evidence was sufficient to establish that each defendant had used a firearm in relation to a drug trafficking offense and affirmed the § 924(c)(1) conviction in each case. 36 F. 3d 106 (CADC 1994) (en banc).

The majority rejected a multifactor weighing approach to determine sufficiency of the evidence to support a § 924(c)(1) conviction. The District of Columbia Circuit had previously applied a nonexclusive set of factors, including: accessibility of the gun, its proximity to drugs, whether or not it was loaded, what type of weapon was involved, and whether expert testimony supported the Government's theory of "use." The majority explained that this approach invited the reviewing court to reweigh the evidence and make its own finding with respect to an ultimate fact, a function properly left to the jury; had produced widely divergent and contradictory results; and was out of step with the broader definition of "use" employed by other Circuits.

The court replaced the multifactor test with an "accessibility and proximity" test. "[W]e hold that one uses a gun, i. e., avails oneself of a gun, and therefore violates [§ 924(c)(1)], whenever one puts or keeps the gun in a particular place from which one (or one's agent) can gain access to it if and when needed to facilitate a drug crime." *Id.,* at 115. The court applied this new standard and affirmed the convictions of both Bailey and Robinson. In both cases, the court determined that the gun was sufficiently accessible and proximate to the drugs or drug proceeds that the jury could properly infer that the defendant had placed the gun in order to fur-

ther the drug offenses or to protect the possession of the drugs.

Judge Wald, in dissent, argued that the court's previous multifactor test provided a better standard for appellate review of § 924(c)(1) convictions. Judge Williams, joined by Judges Silberman and Buckley, also dissented. He explained his understanding that "use" under § 924(c)(1) denoted active employment of the firearm "rather than possession with a contingent intent to use." *Id.*, at 121. "[B]y articulating a 'proximity' plus 'accessibility' test, however, the court has in effect diluted 'use' to mean simply possession with a floating intent to use." *Ibid.*

As the debate within the District of Columbia Circuit illustrates, § 924(c)(1) has been the source of much perplexity in the courts. The Circuits are in conflict both in the standards they have articulated, compare *United States* v. *Torres-Rodriguez,* 930 F. 2d 1375, 1385 (CA9 1991) (mere possession sufficient to satisfy § 924(c)), with *United States* v. *Castro-Lara,* 970 F. 2d 976, 983 (CA1 1992) (mere possession insufficient), cert. denied *sub nom. Sarraff* v. *United States,* 508 U. S. 962 (1993); and in the results they have reached, compare *United States* v. *Feliz-Cordero,* 859 F. 2d 250, 254 (CA2 1988) (presence of gun in dresser drawer in apartment with drugs, drug proceeds, and paraphernalia insufficient to meet § 924(c)(1)), with *United States* v. *McFadden,* 13 F. 3d 463, 465 (CA1 1994) (evidence of gun hidden under mattress with money, near drugs, was sufficient to show "use"), and *United States* v. *Hager,* 969 F. 2d 883, 889 (CA10) (gun in boots in living room near drugs was "used"), cert. denied, 506. U. S. 964 (1992). We granted certiorari to clarify the meaning of "use" under § 924(c)(1). 514 U. S. 1062 (1995).

## II

Section 924(c)(1) requires the imposition of specified penalties if the defendant, "during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a

firearm." Petitioners argue that "use" signifies active employment of a firearm. The Government opposes that definition and defends the proximity and accessibility test adopted by the Court of Appeals. We agree with petitioners, and hold that § 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense.

This action is not the first one in which the Court has grappled with the proper understanding of "use" in § 924(c)(1). In *Smith,* we faced the question whether the barter of a gun for drugs was a "use," and concluded that it was. *Smith* v. *United States,* 508 U. S. 223 (1993). As the debate in *Smith* illustrated, the word "use" poses some interpretational difficulties because of the different meanings attributable to it. Consider the paradoxical statement: "I *use* a gun to protect my house, but I've never had to *use* it." "Use" draws meaning from its context, and we will look not only to the word itself, but also to the statute and the sentencing scheme, to determine the meaning Congress intended.

We agree with the majority below that "use" must connote more than mere possession of a firearm by a person who commits a drug offense. See 36 F. 3d, at 109; accord, *United States* v. *Castro-Lara, supra,* at 983; *United States* v. *Theodoropoulos,* 866 F. 2d 587, 597–598 (CA3 1989); *United States* v. *Wilson,* 884 F. 2d 174, 177 (CA5 1989). Had Congress intended possession alone to trigger liability under § 924(c)(1), it easily could have so provided. This obvious conclusion is supported by the frequent use of the term "possess" in the gun-crime statutes to describe prohibited gun-related conduct. See, *e. g.,* §§ 922(g), 922(j), 922(k), 922(*o*)(1), 930(a), 930(b).

Where the Court of Appeals erred was not in its conclusion that "use" means more than mere possession, but in its standard for evaluating whether the involvement of a firearm amounted to something more than mere possession. Its

proximity and accessibility standard provides almost no limitation on the kind of possession that would be criminalized; in practice, nearly every possession of a firearm by a person engaged in drug trafficking would satisfy the standard, "thereby eras[ing] the line that the statutes, and the courts, have tried to draw." *United States* v. *McFadden, supra,* at 469 (Breyer, C. J., dissenting). Rather than requiring actual use, the District of Columbia Circuit would criminalize "simpl[e] possession with a floating intent to use." 36 F. 3d, at 121 (Williams, J., dissenting). The shortcomings of this test are succinctly explained in Judge Williams' dissent:

> "While the majority attempts to fine-tune the concept of facilitation (and thereby, use) through its twin guideposts of proximity and accessibility, the ultimate result is that possession amounts to 'use' because possession enhances the defendant's confidence. Had Congress intended that, all it need have mentioned is possession. In this regard, the majority's test is either so broad as to assure automatic affirmance of any jury conviction or, if not so broad, is unlikely to produce a clear guideline." *Id.,* at 124–125 (citations omitted).

An evidentiary standard for finding "use" that is satisfied in almost every case by evidence of mere possession does not adhere to the obvious congressional intent to require more than possession to trigger the statute's application.

This conclusion—that a conviction for "use" of a firearm under § 924(c)(1) requires more than a showing of mere possession—requires us to answer a more difficult question. What must the Government show, beyond mere possession, to establish "use" for the purposes of the statute? We conclude that the language, context, and history of § 924(c)(1) indicate that the Government must show active employment of the firearm.

We start, as we must, with the language of the statute. See *United States* v. *Ron Pair Enterprises, Inc.,* 489 U. S.

235, 241 (1989). The word "use" in the statute must be given its "ordinary or natural" meaning, a meaning variously defined as "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." *Smith, supra,* at 228–229 (internal quotation marks omitted) (citing Webster's New International Dictionary of English Language 2806 (2d ed. 1949) and Black's Law Dictionary 1541 (6th ed. 1990)). These various definitions of "use" imply action and implementation. See also *McFadden,* 13 F. 3d, at 467 (Breyer, C. J., dissenting) ("[T]he ordinary meanings of the words 'use and 'carry' . . . connote activity beyond simple possession").

We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. "'[T]he meaning of statutory language, plain or not, depends on context.'" *Brown* v. *Gardner,* 513 U. S. 115, 118 (1994) (citing *King* v. *St. Vincent's Hospital,* 502 U. S. 215, 221 (1991)). Looking past the word "use" itself, we read § 924(c)(1) with the assumption that Congress intended each of its terms to have meaning. "Judges should hesitate . . . to treat [as surplusage] statutory terms in any setting, and resistance should be heightened when the words describe an element of a criminal offense." *Ratzlaf* v. *United States,* 510 U. S. 135, 140–141 (1994). Here, Congress has specified two types of conduct with a firearm: "uses" or "carries."

Under the Government's reading of § 924(c)(1), "use" includes even the action of a defendant who puts a gun into place to protect drugs or to embolden himself. This reading is of such breadth that no role remains for "carry." The Government admits that the meanings of "use" and "carry" converge under its interpretation, but maintains that this overlap is a product of the particular history of § 924(c)(1). Therefore, the Government argues, the canon of construction that instructs that "a legislature is presumed to have used no superfluous words," *Platt* v. *Union Pacific R. Co.,* 99 U. S. 48, 58 (1879), is inapplicable. Brief for United States 24–25.

We disagree. Nothing here indicates that Congress, when it provided these two terms, intended that they be understood to be redundant.

We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning. While a broad reading of "use" undermines virtually any function for "carry," a more limited, active interpretation of "use" preserves a meaningful role for "carries" as an alternative basis for a charge. Under the interpretation we enunciate today, a firearm can be used without being carried, e. g., when an offender has a gun on display during a transaction, or barters with a firearm without handling it; and a firearm can be carried without being used, e. g., when an offender keeps a gun hidden in his clothing throughout a drug transaction.

This reading receives further support from the context of § 924(c)(1). As we observed in *Smith*, "using a firearm" should not have a "different meaning in § 924(c)(1) than it does in § 924(d)." 508 U. S., at 235. See also *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). Section 924(d)(1) provides for the forfeiture of any firearm that is "used" or "intended to be used" in certain crimes. In that provision, Congress recognized a distinction between firearms "used" in commission of a crime and those "intended to be used," and provided for forfeiture of a weapon even before it had been "used." In § 924(c)(1), however, liability attaches only to cases of actual use, not intended use, as when an offender places a firearm with the intent to use it later if necessary. The difference between the two provisions demonstrates that, had Congress meant to broaden application of the statute beyond actual "use," Congress could and would have so specified, as it did in § 924(d)(1).

The amendment history of §924(c) casts further light on Congress' intended meaning. The original version, passed in 1968, read:

"(c) Whoever—

"(1) uses a firearm to commit any felony which may be prosecuted in a court of the United States, or

"(2) carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States,

"shall be sentenced to a term of imprisonment for not less than one year nor more than 10 years." § 102, 82 Stat. 1224.

The phrase "uses a firearm to commit" indicates that Congress originally intended to reach the situation where the firearm was actively employed during commission of the crime. This original language would not have stretched so far as to cover a firearm that played no detectable role in the crime's commission. For example, a defendant who stored a gun in a nearby closet for retrieval in case the deal went sour would not have "use[d] a firearm to commit" a crime. This version also shows that "use" and "carry" were employed with distinctly different meanings.

Congress' 1984 amendment to §924(c) altered the scope of predicate offenses from "any felony" to "any crime of violence," removed the "unlawfully" requirement, merged the "uses" and "carries" prongs, substituted "during and in relation to" the predicate crimes for the earlier provisions linking the firearm to the predicate crimes, and raised the minimum sentence to five years. § 1005(a), 98 Stat. 2138–2139. The Government argues that this amendment stripped "uses" and "carries" of the qualifications ("to commit" and "unlawfully during") that originally gave them distinct meanings, so that the terms should now be understood to overlap. Of course, in *Smith* we recognized that Con-

gress' subsequent amendments to § 924(c) employed "use" expansively, to cover both use as a weapon and use as an item of barter. See *Smith*, 508 U. S., at 236. But there is no evidence to indicate that Congress intended to expand the meaning of "use" so far as to swallow up any significance for "carry." If Congress had intended to deprive "use" of its active connotations, it could have simply substituted a more appropriate term—"possession"—to cover the conduct it wished to reach.

The Government nonetheless argues that our observation in *Smith* that "§ 924(c)(1)'s language sweeps broadly," 508 U. S., at 229, precludes limiting "use" to active employment. But our decision today is not inconsistent with *Smith*. Although there we declined to limit "use" to the meaning "use as a weapon," our interpretation of § 924(c)(1) nonetheless adhered to an active meaning of the term. In *Smith*, it was clear that the defendant had "used" the gun; the question was whether that particular use (bartering) came within the meaning of § 924(c)(1). *Smith* did not address the question we face today of what evidence is required to permit a jury to find that a firearm had been used at all.

To illustrate the activities that fall within the definition of "use" provided here, we briefly describe some of the activities that fall within "active employment" of a firearm, and those that do not.

The active-employment understanding of "use" certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm. We note that this reading compels the conclusion that even an offender's reference to a firearm in his possession could satisfy § 924(c)(1). Thus, a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense is a "use," just as the silent but obvious and forceful presence of a gun on a table can be a "use."

The example given above—"I *use* a gun to protect my house, but I've never had to *use* it"—shows that "use" takes

on different meanings depending on context. In the first phrase of the example, "use" refers to an ongoing, inactive function fulfilled by a firearm. It is this sense of "use" that underlies the Government's contention that "placement for protection"—*i. e.*, placement of a firearm to provide a sense of security or to embolden—constitutes a "use." It follows, according to this argument, that a gun placed in a closet is "used," because its mere presence emboldens or protects its owner. We disagree. Under this reading, mere possession of a firearm by a drug offender, at or near the site of a drug crime or its proceeds or paraphernalia, is a "use" by the offender, because its availability for intimidation, attack, or defense would always, presumably, embolden or comfort the offender. But the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1). Perhaps the nonactive nature of this asserted "use" is clearer if a synonym is used: storage. A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession.

A possibly more difficult question arises where an offender conceals a gun nearby to be at the ready for an imminent confrontation. Cf. 36 F. 3d, at 119 (Wald, J., dissenting) (discussing distinction between firearm's accessibility to drugs or drug proceeds and its accessibility to defendant). Some might argue that the offender has "actively employed" the gun by hiding it where he can grab and use it if necessary. In our view, "use" cannot extend to encompass this action. If the gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not "used." To conclude otherwise would distort the language of the statute as well as create an impossible line-drawing problem. How "at the ready" was the firearm? Within arm's reach? In the room? In the house? How long before the confrontation did he place it there? Five minutes or 24 hours? Placement for later active use does not constitute "use." An alternative

rationale for why "placement at the ready" is a "use"—that such placement is made with the intent to put the firearm to a future active use—also fails. As discussed above, § 924(d)(1) demonstrates that Congress knew how to draft a statute to reach a firearm that was "intended to be used." In § 924(c)(1), it chose not to include that term, but instead established the 5-year mandatory minimum only for those defendants who actually "use" the firearm.

While it is undeniable that the active-employment reading of "use" restricts the scope of § 924(c)(1), the Government often has other means available to charge offenders who mix guns and drugs. The "carry" prong of § 924(c)(1), for example, brings some offenders who would not satisfy the "use" prong within the reach of the statute. And Sentencing Guidelines § 2D1.1(b)(1) provides an enhancement for a person convicted of certain drug-trafficking offenses if a firearm was possessed during the offense. United States Sentencing Commission, Guidelines Manual § 2D1.1(b)(1) (Nov. 1994). But the word "use" in § 924(c)(1) cannot support the extended applications that prosecutors have sometimes placed on it, in order to penalize drug-trafficking offenders for firearms possession.

The test set forth by the Court of Appeals renders "use" virtually synonymous with "possession" and makes any role for "carry" superfluous. The language of § 924(c)(1), supported by its history and context, compels the conclusion that Congress intended "use" in the active sense of "to avail oneself of." To sustain a conviction under the "use" prong of § 924(c)(1), the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime.

### III

Having determined that "use" denotes active employment, we must conclude that the evidence was insufficient to support either Bailey's or Robinson's conviction for "use" under § 924(c)(1).

The police stopped Bailey for a traffic offense and arrested him after finding cocaine in the driver's compartment of his car. The police then found a firearm inside a bag in the locked car trunk. There was no evidence that Bailey actively employed the firearm in any way. In Robinson's case, the unloaded, holstered firearm that provided the basis for her § 924(c)(1) conviction was found locked in a footlocker in a bedroom closet. No evidence showed that Robinson had actively employed the firearm. We reverse both judgments.

Bailey and Robinson were each charged under both the "use" and "carry" prongs of § 924(c)(1). Because the Court of Appeals did not consider liability under the "carry" prong of § 924(c)(1) for Bailey or Robinson, we remand for consideration of that basis for upholding the convictions.

*It is so ordered.*