IT IS ORDERED that the motion is GRANTED and the order of suspension is lifted.

UNITED STATES of America, Plaintiff–Appellee,

v.

Marvin L. MONROE, Defendant–Appellant.

No. 94–3973.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1995.

Decided Dec. 22, 1995.

Fannie J. Harris (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, Michael C. Carr, Office of the United States Attorney, Benton, IL, for Plaintiff–Appellee.

Gwendolyn D. Anderson (argued), Anderson & Associates, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant Marvin L. Monroe was convicted by a jury on both counts of his indictment. Count I charged him with conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged him with knowingly using or carrying a firearm during and in relation to the drug-trafficking crime charged in Count I in violation of 18 U.S.C. § 924(c)(1) and (2). Defendant appeals his convictions. For the following reasons, we affirm in part and reverse in part.

## BACKGROUND

In late 1993, the police departments of Sparta, Illinois, and Percy, Illinois, the Federal Bureau of Investigation, and the Perry County, Illinois Sheriff's Department began a narcotics investigation based upon information provided by a confidential informant. A surveillance was conducted for a period of three months during which officers observed the informant make purchases of cocaine from Karl Bradford Williams ("Brad"), his wife Tamera Renee Williams ("Tammy") and Gus Quihuis.

On January 16, 1994, Tammy told the informant that she wanted the two of them to jointly buy fourteen ounces of cocaine from Quihuis. Just before Tammy was to meet Quihuis for the purchase, the police executed a search warrant on the Williams' residence. The search recovered a small amount of cocaine, a cocaine press, cutting agents, and a .22 caliber pistol. Tammy then agreed to cooperate with the authorities and complete the transaction with Quihuis. Quihuis was arrested and a search warrant was executed on his Percy, Illinois home just as he and Tammy were to make the drug transaction. The search of Quihuis's home recovered a large amount of cocaine, a .22 caliber pistol, a .9 millimeter semi-automatic pistol, a shotgun, and over $13,000 in cash. After his arrest, Quihuis also agreed to cooperate with the authorities and named defendant and Francisco Vargas of California as his suppliers.

Quihuis testified at trial that he met defendant during the summer of 1991 through Britt Roberts, when Quihuis and Roberts purchased a small quantity of crack cocaine from defendant. In the beginning of Quihuis's relationship with defendant, Quihuis always purchased defendant's cocaine by going through Roberts. However, Quihuis soon began dealing with defendant directly, initially purchasing small amounts of cocaine for personal consumption, but gradually buying larger quantities for resale. Although they did not directly share profits, both defendant and Quihuis were in the cocaine-

selling business together and bought and sold to and from each other on numerous occasions as their "businesses" needed. Quihuis sold most of his cocaine through his distributors: Tammy, Brad, Eugene Rickers, and Tammy's brother, Randy Jendrin. While Tammy and Brad knew defendant as a drug dealer, neither had personal contact with him. By 1992, Quihuis's drug business had increased to the point that defendant was purchasing most of the powdered cocaine he used to produce crack cocaine from Quihuis.

During the summer of 1993, defendant arranged a drug transaction between his brother in Chicago and Quihuis. Defendant drove Quihuis to Chicago where Quihuis purchased half of a kilo of cocaine in exchange for $14,000. Defendant then drove Quihuis back to Sparta, Illinois, where defendant received one ounce of cocaine from Quihuis for setting up the deal and purchased another for $700. Defendant and Quihuis made an identical trip in August of 1993 and again Quihuis purchased half of a kilo of cocaine from defendant's brother.

The day after Quihuis's arrest, he made two recorded telephone calls to defendant and went to defendant's residence wearing a wire transmitter, which recorded them discussing the arrangement of another half-kilo transaction. On January 21, 1994, defendant was arrested at Quihuis's home and the police seized a small quantity of cocaine from defendant's person. Subsequently, a search warrant was executed on defendant's home, where the authorities recovered numerous pieces of paper with Quihuis's telephone number on them, cocaine residue on various objects, a gram scale, and $600 in cash. On February 14, 1994, defendant was again arrested pursuant to federal warrant and indicted as a conspirator with Quihuis, Tammy, Brad, and Rickers for the offense of conspiracy to distribute and possess with the intent to distribute a controlled substance. Defendant and Quihuis were also charged with possession of a firearm during and in relation to the commission of the drug trafficking offense.

Defendant proceeded to trial by jury on July 11, 1994. Quihuis, Tammy, Brad, and Rickers all pleaded guilty to the counts for which they were charged and Quihuis and Rickers testified for the Government at defendant's trial. At the end of the Government's case, defendant made a motion for Judgment of Acquittal, challenging the sufficiency of the evidence on both counts. This motion was denied. On July 13, 1994, he was convicted and later sentenced to 240 months on Count I and 60 months consecutively on Count II. He appeals his convictions on the basis of insufficient evidence as to both counts. We have jurisdiction of his appeal pursuant to 28 U.S.C. § 1291.

## DISCUSSION

In reviewing a challenge to the sufficiency of the evidence in a jury trial, "the standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994).

### 1. *Count I*

To sustain a conspiracy conviction, the Government must provide substantial evidence that a conspiracy existed and that the defendant knowingly agreed to join that conspiracy. *United States v. Carson*, 9 F.3d 576, 587 (7th Cir.1993). A conspiracy is a "combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Gutierrez*, 978 F.2d 1463, 1469 (7th Cir.1992). Defendant does not dispute that a conspiracy existed between his co-defendants; rather, he asserts that he never joined that conspiracy. He first argues that he had never met Tammy or Brad and therefore could not have been involved in a conspiracy with them. However, it is well settled that "a conspiracy can exist ... even if each participant does not know the identity of the others or does not participate in all the events." *United States v. Shorter*, 54 F.3d 1248, 1255 (7th Cir.1995). All that is required is that "a participant know of the others' existence and their activities to further the conspiracy." *Id.* The evidence

demonstrated that despite the fact that defendant did not know Tammy and Brad personally, he did know that Quihuis had others who were selling the cocaine that defendant provided him. By supplying the large amounts of cocaine to Quihuis over an extended period of time with knowledge of this fact, defendant joined the conspiracy between Quihuis and his distributors.

Defendant further argues that his relationship with the members of the conspiracy was merely that of a buyer/seller, not that of a participant. See *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991). However, the Government's evidence demonstrated that defendant's relationship with Quihuis was more than that of a buyer/seller. Quihuis testified that defendant had contacted East St. Louis suppliers and set up a five-ounce purchase of cocaine for Quihuis. [Tr.T. 13]. Defendant drove Quihuis to this transaction and acted as a middleman because of the suppliers' distrust of strangers. [Tr.T. 14]. Defendant was compensated for his role by receiving a portion of the cocaine. Quihuis further testified that defendant arranged two other transactions of half of a kilo of cocaine each between his brother and Quihuis. [Tr.T. 23–24]. For these transactions, defendant again acted as the middleman, drove Quihuis to and from the purchase, and was again compensated for his role by receiving a portion of the cocaine. Additionally, the taped conversations between Quihuis and defendant revealed that their relationship was continuous in that defendant was to arrange the future purchase of another half of a kilo from his brother. This evidence sufficiently indicates that defendant's role in the conspiracy was more than that of a buyer/seller.

Finally, defendant asserts that the Government presented no evidence of "mutual support" or "mutual dependency" between himself and his co-defendants that would prove a conspiracy. See *United States v. Cerro*, 775 F.2d 908 (7th Cir.1985); *United States v. Percival*, 756 F.2d 600 (7th Cir.1985). The record reveals, however, that in response to defendant's statement in a taped conversation that "Quihuis is making money off him," Quihuis said "yeah, we always come back for each other." Quihuis further testified that he and defendant agreed and depended upon each other to keep their respective personal and resale supplies of cocaine replenished [Tr.T. 165–166]. Based upon the foregoing, we agree with the district court that there was sufficient evidence presented for a rational trier-of-fact to have found that defendant was a participant in the conspiracy to distribute and possess with intent to distribute cocaine.

### 2. *Count II*

■ Defendant also argues that the evidence presented at trial was insufficient to prove that he was guilty of knowingly using or carrying a firearm during and in relation to the drug-trafficking crime charged in Count I. Defendant concedes that if sufficient evidence existed, as we have found, to convict him of the drug-trafficking offense charged in Count I, then *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, applies and he is liable for the acts of co-conspirators in furtherance of the conspiracy, including violations of 18 U.S.C. § 924(c)(1). See *United States v. Ocampo*, 890 F.2d 1363, 1372 (7th Cir.1989) ("Under the *Pinkerton* doctrine, a defendant may be found guilty of violating Section 924(c) if a co-conspirator used or carried a firearm during and in relation to the conspiracy.").

Section 924(c) makes it a violation for a defendant to either "use" or "carry" a firearm during a drug-trafficking offense. There is no evidence in the record to prove that any of the conspirators actually "carried" a firearm at the time of defendant's Count I violation. However, the Government argues that the evidence presented does demonstrate that the conspirators "used" firearms during that time. This evidence is as follows. Along with cocaine, the authorities found a variety of weapons at Quihuis's residence, including a .22 caliber handgun, a .9 millimeter semi-automatic pistol, and a shotgun. [Tr.T. 45–47]. Quihuis testified that he used these guns to protect his drugs and drug money and that he had informed defendant directly of this fact. [Tr.T. 36–37].

Under prior cases decided by this Court, this evidence would have been sufficient to uphold defendant's conviction. We have pre-

viously held that "the government need not prove that [a] weapon was actually used or brandished" to secure a conviction under § 924(c)(1). *United States v. Edwards*, 36 F.3d 639, 644 (7th Cir.1994). It was considered sufficient if the evidence demonstrated that a firearm was in "strategic proximity" to the drugs in question. *United States v. Malin*, 908 F.2d 163, 168 (7th Cir.1990), certiorari denied, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544; see also *Edwards*, 36 F.3d at 644; *United States v. Carson*, 9 F.3d 576, 582 (7th Cir.1993); *United States v. Villagrana*, 5 F.3d 1048, 1052 (7th Cir.1993); *United States v. Woods*, 995 F.2d 713, 718 (7th Cir. 1993). In these situations we concluded that a defendant who maintains an accessible firearm near the drugs or transactions "uses" the weapon to protect his drugs and thereby violates § 924(c)(1). *Woods*, 995 F.2d at 718.

However, we must now analyze this evidence in light of the United States Supreme Court's recent decision in *Bailey v. United States*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472. In *Bailey*, a consolidated appeal, two defendants had been involved in separate drug-trafficking offenses. Searches lead authorities to discover firearms in the vicinity of narcotics in the defendants' car and home, respectively, which resulted in both being convicted for § 924(c)(1) violations. The Court of Appeals for the District of Columbia Circuit affirmed the convictions based upon an "accessibility and proximity" theory similar to this Circuit's "strategic proximity" theory discussed above. 36 F.3d 106, 115 (D.C.Cir.1994) (en banc) ("[W]e hold that one uses a gun, i.e., avails oneself of a gun, and therefore violates [§ 924(c)(1) ], whenever one puts or keeps the gun in a particular place from which one (or one's agent) can gain access to it if and when needed to facilitate a drug crime."). The Supreme Court granted certiorari to determine the precise meaning of the word "use" in § 924(c)(1).

The Supreme Court agreed with the Court of Appeals "that 'use' must connote more than mere possession of a firearm by a person who commits a drug offense." *Id.* at —, 116 S.Ct. at 505. However, the Court disapproved of the "proximity and accessibility" test because it "provides almost no limitation on the kind of possession that would be criminalized." *Id.* The Court further stated that such a "broad reading of 'use' undermines virtually any function for 'carry'" in § 924(c)(1). *Id.* at —, 116 S.Ct. at 506.

■ The Court concluded that the better test is "active employment" of the firearm. *Id.* at —, 116 S.Ct. at 505 ("The language, context and history of § 924(c)(1) indicate that the Government must show active employment of the firearm."). Activities that fall within the active-employment interpretation of "use" include "brandishing, displaying, bartering, striking with, … firing or attempting to fire, a firearm," as well as "an offender's reference to a firearm in his possession." *Id.* at —, 116 S.Ct. at 508. "Nonactive use," on the other hand, is the "mere possession of a firearm by a drug offender, at or near the site of a drug crime or paraphernalia," and is not sufficient to trigger § 924(c)(1). *Id.* Because no evidence showed that the defendants had used the firearms in the "active employment" sense, the Court reversed both convictions.

■ The case before us is nearly identical to the situation in *Bailey*. The Government's evidence indicated that Quihuis possessed several firearms in the vicinity of the cocaine. However, the Government presented no evidence that any of the conspirators "used" the firearms in the "active-employment" sense described in *Bailey*. Therefore, defendant's § 924(c)(1) conviction is reversed.

### CONCLUSION

Because the evidence was sufficient to support the jury's verdict as to Count I of defendant's indictment, that portion of the district court's judgment is affirmed. However, because the evidence was insufficient to support the jury's verdict that defendant, or any of his co-conspirators, "used" a firearm in violation of § 924(c)(1), that portion of the judgment is reversed.