UNITED STATES of America

v.

Jay Harry LOCKE, Defendant.

Civil Action No. 96–344 ERIE.
Criminal No. 95–9 Erie.

United States District Court,
W.D. Pennsylvania,
Erie Division.

Nov. 30, 1999.

John Trucilla, Assistant U.S. Attorney, Erie, PA, for U.S.

Shelley Stark, Federal Public Defender, Pittsburgh, PA, for Jay Harry Locke.

## MEMORANDUM ORDER

McLAUGHLIN, District Judge.

Presently pending before the Court is a motion by Petitioner Jay Harry Locke to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. For the reasons that follow, Locke's motion will be granted in part and denied in part.

## I. PROCEDURAL HISTORY

In March 1995, a federal grand jury returned a ten-count indictment charging Locke with various firearm and drug-related offenses. A superseding indictment was returned on May 17, 1995, adding eight counts of alleged money laundering.

On November 27, 1995, Locke pleaded guilty to four of the counts, *to wit,* conspiracy to distribute and possess with intent to distribute marihuana (Count I); knowingly and intentionally distributing and possessing with the intent to distribute less than 50 kilograms of marihuana (Count VIII); using two firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count IX); and conspiracy to launder money instruments (Count XI). Locke waived his right to a pre-sentence investigation report and stipulated to a proposed sentence of 204 months.

A sentencing hearing was held immediately following the change of plea. The Court sentenced Locke to a term of 144 months imprisonment as to Counts I, VIII and XI and a consecutive term of imprisonment of 60 months as to Count IX. Additionally, Locke was sentenced to an eight-year term of supervised release upon completion of his term of incarceration. In accordance with the parties' plea agreement, the government subsequently dismissed the remaining counts in the Superseding Indictment. Six days after Locke's judgment was entered on the record, the Supreme Court decided *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) and clarified that "use" of a firearm for purposes of 18 U.S.C. § 924(c)(1) requires "active employment" of the firearm, as opposed to mere possession or storage of a firearm at or near the scene of a drug crime. *Id.* at 143–44, 149, 116 S.Ct. 501. Although represented by counsel at his plea and sentencing, Locke never took a direct appeal.

Instead, on October 8, 1996 Locke, acting *pro se,* filed the instant motion to vacate his sentence under 28 U.S.C. § 2255. In his original *pro se* papers, he asserted two principle arguments for relief. First, Locke argued that his guilty plea as to Count IX was not knowing and voluntary because it was based on the erroneous belief that he had violated 18 U.S.C. § 924(c)(1) when in fact, Locke contended, his conduct did not constitute the "use" of a firearm as defined in *Bailey.* Accordingly, Locke requested that his conviction and sentence on Count IX be vacated. Locke's second *"pro se* argument" was that his trial counsel was ineffective in advising him to waive his right to a presentence investigative report and in further advising him to stipulate to a proposed sentence of 204 months. According to Locke, this stipulated proposed sentence was far in excess of what he might have received, had he proceeded to trial and been convicted. By way of relief, Locke requested that his sentence of 144 months as to Counts I, VIII and XI be vacated and that he be resentenced in accordance with applicable law or, in the

alternative, that his conviction on those charges be vacated.

Because the factual underpinnings of the government's § 924(c)(1) charge were not clear from the plea colloquy transcript, this Court held an evidentiary hearing on May 11, 1998. The testimony established that, in December of 1994, Locke was the subject of a criminal investigation concerning suspected drug offenses. (Tr. 6.)[1] One of the individuals who assisted in the government's investigation was Jeffrey Caldwell. Caldwell had been acquainted with Locke since approximately 1984 or 1985 and had on occasion purchased marihuana from Locke. (*Id.*)

On December 22, 1994, after being fitted with a body wire by state law enforcement agents, Caldwell proceeded with his then girlfriend, Shirley St. John,[2] to the residence of Locke's girlfriend, Michelle Phillips, at 203 Timberlake Drive in McKean, Pennsylvania. (Tr. 7–9, 21–23, 50–51, 65.) Caldwell and St. John remained at that residence for approximately one hour engaging in casual conversation with Phillips and/or Locke in Phillips's living room. (Tr. 12–13.) During that encounter, Locke gave Caldwell two small baggies of marihuana—a "quarter ounce," according to Caldwell—valued at approximately $40 per bag.[3] (Tr. 8, 22.) No money exchanged hands, but Caldwell testified that he "knocked" the price of the marihuana off a "tab" that Locke had running for a preexisting debt owed to Caldwell. (Tr. 8.) At a later point, Caldwell contradicted this testimony somewhat and described the transaction as "just personal weed that he had given me. It wasn't anything he sold me, as far as knocking off my bill or anything, it was just some personal weed that he

gave me to smoke because I was out." (Tr. 59.)

During the time that Caldwell was in Phillips's home, there was present in the corner of Phillips's living room an AK–47 semi-automatic assault rifle. (Tr. 9, 13, 16.) At one point prior to the exchange of marihuana, Locke picked up the weapon, "racked it,"[4] "showed off" with it, and set it back in the corner of the living room. (Tr. 9, 13, 57–59, 60–61.) Caldwell testified that the rifle appeared to have a "banana clip" inserted in it, but he could not tell whether the clip contained any ammunition. (Tr. 10–12.) Because Locke only "racked" the weapon once and never attempted to "dry fire" it, Caldwell could not be sure whether in fact the weapon was loaded. (Tr. 11–12, 61–62.) Caldwell denied that Locke ever pointed the gun at anyone or waived it around. (Tr. 10.) He described Locke's conduct as "more or less ... like a showing off thing, like if you would have gotten your picture taken with a gun at a carnival." (*Id.*) Caldwell testified that there was no evident purpose in Locke's picking up the rifle. (R. 15–16.) He could not recall what precipitated Locke's handling of the firearm and he admitted that he might have asked Locke about it. (Tr. 13, 15–16, 56.) Caldwell recalled having specifically expressed interest in the weapon to Locke on at least one prior occasion. (Tr. 56.) When asked how long Locke had handled the rifle, Caldwell replied, "[N]ot long, just long enough to pick it up, rack it and like show off with it .... and then put it back." (Tr. 13.) By the time the exchange of marihuana occurred, the rifle had already been placed back in the corner of the living room. (Tr. 59.) Caldwell stated that Locke did not exhibit any kind of malice in

---

**1.** Citations are to the transcript of the May 11, 1998 hearing [Doc. No. 151].

**2.** At the time of the May 11, 1998 hearing, Ms. St. John was Caldwell's wife and went by the name Shirley Caldwell. (Tr. 9, 62–63.)

**3.** This exchange forms the basis of Count VIII of the Superseding Indictment.

**4.** The term "racking," as explained by Caldwell, was meant to indicate Locke's actions in pulling back on the weapon's slide mechanism which would theoretically move a shell from the ammunition clip into the firing chamber, assuming that the ammunition clip is not empty. (*See* Tr. at 9–12.)

handling the weapon and further stated that he (Caldwell) never felt threatened by Locke's conduct. (Tr. 10, 56–57.) However, when asked whether Ms. St. John was concerned about the gun, Caldwell replied, "Yes, she's always concerned about the presence of guns." (Tr. 14.)

Subsequent to the evidentiary hearing, the Supreme Court decided *Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) and delineated the circumstances under which a defendant may rely upon *Bailey* to collaterally challenge a pre-*Bailey* guilty plea to a § 924(c)(1) charge. Specifically, the Court ruled that, when a defendant has procedurally defaulted a challenge to the voluntariness and intelligence of a § 924(c)(1) guilty plea by failing to raise the issue on direct appeal, such a challenge may be raised in a collateral proceeding only if the defendant can first demonstrate either "cause" and "actual prejudice," or that he is "actually innocent" of the § 924(c)(1)conviction and any "more serious charges" dismissed in the plea bargaining process. *Id.* at 622–24, 118 S.Ct. 1604. In light of *Bousley* and Locke's own apparent procedural default, we asked the parties to brief four distinct issues:

1. whether Locke could demonstrate "cause" for his apparent procedural default, as well as "actual prejudice";

2. alternatively, whether Locke can demonstrate "actual innocence" relative to the § 924(c)(1) charge under the standard set forth in *Bousley;*

3. whether Locke can demonstrate "actual innocence" as to any potentially "more serious charges" that the government agreed to forego in the course of plea bargaining; and

4. whether Locke would be precluded from establishing "actual innocence"

of more serious charges by virtue of his prior stipulations in his plea agreement.

(*See* Order dated 8/27/98 [Doc. No. 146].)

The Court granted Locke's request for appointment of counsel who could assist in addressing these issues. Locke, now represented, has filed his brief and the government has responded. Accordingly, the issues are ripe for resolution.

## II. DISCUSSION

Pursuant to 28 U.S.C. § 2255, a prisoner in federal custody may move the court which imposed sentence to vacate, set aside or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C.A. § 2255 (West Supp.1999).

### A.

The first issue this Court must address is whether there is a procedural bar precluding us from addressing Locke's § 2255 motion. In addressing this issue, Locke (now represented by counsel) contends that his sentence must be vacated because the Court failed to inform him at time of sentencing that he had a right to appeal his sentence. *See* Fed.R.Crim.P. 32(c)(5).[5] Locke cites numerous federal appellate decisions holding that a district court's failure to advise a defendant of his right to appeal his sentence constitutes a per se error requiring vacatur of the sentence and a remand for re-sentencing, regardless of whether the defendant had actual knowledge of his right to appeal. *See, e.g., Thompson v. United States,* 111 F.3d 109, 110 (11th Cir.1997); *United States v. San-*

---

5. Rule 32(c)(5) provides:

 **Notification of Right to Appeal.** After imposing sentence in a case which has gone to trial on a plea of not guilty, the court must advise the defendant of the right to appeal. After imposing sentence in any case, the court must advise the defendant of any right to appeal the sentence, and of the

right of a person who is unable to pay the cost of an appeal to apply for leave to appeal in forma pauperis. If the defendant so requests, the clerk of court must immediately prepare and file a notice of appeal on behalf of the defendant.

Fed.R.Crim.P. 32(c)(5).

*chez,* 88 F.3d 1243, 1247, 1249–50 (D.C.Cir. 1996); *Reid v. United States,* 69 F.3d 688, 689–90 (2d Cir.1995). Our review of the transcript from Locke's November 27, 1995 plea and sentencing confirms that Locke was never advised of his right to appeal his sentence.

 Recently, the United States Supreme Court decided *Peguero v. United States,* 526 U.S. 23, 119 S.Ct. 961, 963, 143 L.Ed.2d 18 (1999), in which it held that a district court's failure to advise the defendant of his right to appeal does not entitle the defendant to habeas relief if he knew of his right and hence suffered no prejudice from the omission. *See also* Fed. R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). *Peguero* thus abrogates the holdings of *Thompson, Sanchez,* and *Reid. See Peguero,* 526 U.S. at 24, 119 S.Ct. at 963. Nevertheless, the government has not contended that Locke independently knew of his right to appeal, nor would the record support such a finding. *See Soto v. United States,* 185 F.3d 48, 50 (2d Cir.1999) (on violation of Fed.R.Crim.P. 32(c)(5), government bears the burden of establishing harmless error by showing through clear and convincing evidence that the defendant either actually exercised his right to appeal, waived this right, or had independent knowledge of this right); *Tress v. United States,* 87 F.3d 188, 190 (7th Cir.1996) (government has burden to demonstrate harmless error where defendant was not advised at time of sentencing of his right to appeal).

Because we cannot say that the error here was harmless under *Peguero* and Rule 52(a), Locke's sentence must be vacated. Further, because Locke is entitled to collateral relief, we need not address the arguments concerning procedural default under *Bousley.*

**B.**

We next consider the merits of Locke's claim that his § 924(c)(1) conviction should be vacated. At the time of the conduct in question, § 924(c)(1) made it unlawful to "use" or "carry" a firearm "during and in relation to any ... drug trafficking crime." 18 U.S.C.A. § 924(c)(1) (1994).[6] Under Count IX of the Superseding Indictment, Locke was charged with using the AK–47 during and in relation to the transfer of marihuana to Caldwell on December 22, 1994.[7] Locke contests his conviction under Count IX on two grounds: first, that he did not "use" the AK–47 within the meaning of § 924(c)(1); second, that any alleged use of the weapon was not "during and in relation to" the transfer of marihuana to Caldwell.

### 1. *"Use"*

In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court held that the term "use," for purposes of § 924(c)(1), requires "active employment" of the firearm, which would include brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire the weapon. *Id.* at 143, 148, 116 S.Ct. 501. Consistent with this interpretation, the Court observed, even an offender's reference to a firearm in his possession could constitute "use" under § 924(c)(1) if it was "calculated to bring about a change in the circumstances of the predicate offense," just as "the silent but obvious and forceful presence of a gun on a table" could be a "use." 516 U.S. at 148, 116 S.Ct. 501.

 On the other hand, the mere possession of, or proximity to, a firearm during the commission of the underlying offense, would not suffice. 516 U.S. at 143, 146–149, 116 S.Ct. 501. For example, a defendant would not have "used" a firearm

---

**6.** Section 924(c)(1) provided, in relevant part:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punish-

ment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

**7.** There is no allegation that Locke "carried" the firearm in violation of § 924(c)(1).

merely because he placed it nearby in order to provide a sense of security or to embolden himself. *Id.* at 149, 116 S.Ct. 501. "[T]he inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." *Id.* Nor would it be "use" to conceal a gun nearby to be at the ready for an imminent confrontation. *Id.* "If a gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not 'used.'" *Id.*

■ In this case, the government's best evidence shows that Locke's behavior in picking up the AK–47 and "racking" it was in the nature of "showing off," as if posing with the weapon to have his picture taken. Thus, Locke certainly "displayed" the weapon and, by handling it in an ostentatious manner, arguably "brandished" it as well.[8] However, we do not read *Bailey* as establishing a *per se* rule that any displaying or brandishing of a firearm necessarily constitutes "use" under § 924(c)(1). *See, e.g., Latorre v. United States,* 193 F.3d 1035, 1037 (8th Cir.1999) (rejecting per se rule that visible presence of a firearm during a drug sale constitutes use during and in relation to the drug crime: "If the visible presence of a firearm is accompanied by circumstances that combine to create an implicit threat, then the firearm has been 'used.' Otherwise the firearm is merely present."). It is important to remember that *Bailey* requires an active employment of a firearm which makes it *"an operative factor in relation to the predicate offense." Bailey,* 516 U.S. at 143, 116 S.Ct. 501. The question we must answer, then, is whether a rational jury could find that Locke's conduct with the AK–47 somehow affected or was "calculated to bring about a change in the circumstances of the underlying transaction." *Id.* at 148, 116 S.Ct. 501. We answer that question in the negative.

Presumably, the point of "using" a firearm during a drug trafficking crime is to protect oneself or one's drugs, paraphernalia or money, to intimidate customers, potential rivals or enemies, to preclude bargaining or haggling, or the like. Yet the circumstances here do not suggest the kind of environment where such "use" would likely be necessary. The testimony established that Caldwell had been acquainted with Locke for approximately ten years prior to their encounter on December 22, 1994. Over the course of his acquaintanceship with Locke, Caldwell had been to Michelle Phillips's residence, had purchased marihuana from Locke, and thus was presumably familiar with the environment and with Locke's manner of doing business. The transaction that occurred on December 22, 1994 involved a relatively small amount of marihuana. Although there is some contradiction in the record as to whether the marihuana was in exchange for a prior debt or was just "personal weed" which Locke gave to Caldwell, it is clear that no money exchanged hands on that date. Although Locke may have been involved with larger volumes of drugs, there is no evidence in the record that Locke had significant amounts of marihuana or cash on hand during his encounter with Caldwell on December 22, 1994. Thus, the circumstances do not suggest any purpose or need for Locke to protect himself, or any drugs or cash, insofar as his interaction with Caldwell was concerned. On the contrary, Caldwell's description of the encounter suggests a somewhat casual visit, one in which the parties were "[j]ust gabbing there, basically shooting the bull." (Tr. 12.)

■ Locke's alleged manner of handling the AK–47 is also significant. According to Caldwell, Locke picked up the gun, handled it long enough to "rack" it and "show

---

8. *See* Webster's Ninth New Collegiate Dictionary 175 (1990) ("**brandish:** ... **1.** to shake or wave (as a weapon) menacingly; **2.** to exhibit in an ostentatious or aggressive manner"); The Random House Dictionary of the English Language 254 (2d Ed.1987) ("**brandish** ... **1.** to shake or wave, as a weapon; flourish ... **2.** a flourish or waving as of a weapon").

off" with it "as if having his picture taken with it," and then placed it in the corner of the living room. Locke never waived the weapon about or pointed it. Further, Caldwell testified that he did not feel threatened by Locke's conduct—a fact that is quite telling since, at the time of the encounter, Caldwell was not only wired and acting as a police informant, but also had his girlfriend with him.[9] Caldwell could not recall what precipitated Locke's handling of the gun, and testified that there was no evident purpose or reason for the gun's presence in the living room. He had noticed it resting in the corner of the living room on prior occasions. He was thus not only familiar with the weapon, but had an interest in it himself, having commented on a previous occasion that he would like to fire an AK–47 himself. In fact, Caldwell acknowledged that he may have prompted Locke's handling of the weapon by asking about it during the December 22 encounter. In any event, however, Caldwell stated that there was nothing malicious about the manner in which Locke handled the firearm and he was never in fear that Locke was going to use the gun on him.

The government points out that the AK–47 had a clip inserted into it and, because Locke apparently did not "rack" the weapon more than once and placed it back down without attempting to "dry fire" it, Caldwell could not and did not know whether or not the weapon was actually loaded. However, the testimony also suggests that, during Locke's handling of the rifle, the weapon's safety lock was engaged:

Q: In other words, did [Locke] rack [the AK–47] and then press the trigger?

A: Take it off safe and press the trigger, no.

(Tr. 61.)

The Court concludes that, under the totality of circumstances, no jury would be justified in finding that Locke "used" the AK–47 "during and in relation to" the transfer of marihuana to Caldwell on December 22, 1994. Even taking the evidence in the light most favorable to the government, we do not think it supports a finding that the weapon was in any way an operative factor in the underlying drug transaction. The circumstances here do not bespeak the kind of intense or dangerous atmosphere where firearms would likely enhance or protect a transaction. There was no evidence, e.g., of a stash of money that Locke would need to secure, since Caldwell did not pay cash for the marihuana he received. The amount of the marihuana itself was relatively small, and at one point was described by Caldwell as "just some personal weed that [Locke] had given me because I was out." There is no evidence that there were other items of considerable value present that would require protection. In fact, there is no evidence that Locke received anything of value in the transaction that he would need to secure. Locke and Caldwell were presumably well acquainted, having known each other for many years. There was no apparent need to prevent haggling over price, since no price was ever mentioned and the amount of the exchange was relatively small. In short, nothing in the circumstances of the exchange between Locke and Caldwell suggests that the firearm was useful to the completion of the

9. We note the government's position that Caldwell's subjective impression is irrelevant for purposes of determining "use" because, in the government's view, "use" is an objective inquiry. This Court does not suggest that the subjective impression of a bystander is necessarily determinative *per se* of whether a firearm has been "used" under § 924(c)(1). However, we think that, under a "totality of circumstances" analysis, it is certainly one important circumstantial factor that the Court can consider. *See, e.g., United States v. Czeck,*

105 F.3d 1235, 1241 (8th Cir.1997) (upholding § 924(c)(1) conviction based in part on testimony from two of defendant's customers that defendant's display of a weapon affected their dealings with him; court found that "[b]y making it plain to his customers that he was armed and willing to defend his business, Czeck discouraged them from any attempt to rob him and effectively may have warned them that negotiation over the price and quality of his wares was not encouraged.").

transaction. Nothing in the circumstances suggests that Caldwell or St. John presented any threat to the transaction, or any threat to Locke personally or to Phillips or to their personal possessions.

The government makes much of the fact that Caldwell's then girlfriend, Shirley St. John, was concerned about the AK–47. But it is undisputed that the transaction at issue here occurred between Locke and Caldwell only. (*See* Tr. at 9.) Ms. St. John was, at most, a bystander whose presence did not have any discernible affect on the exchange of marihuana from Locke to Caldwell. Moreover, the only evidence concerning Ms. St. John was the following exchange:

Q: You mentioned that your [now] wife was present, was your wife concerned about the presence of that gun?

A. Yes, she's always concerned about the presence of guns.

(Tr. 14.) While this testimony suggests that Ms. St. John had a general concern about firearms, it does not necessarily suggest that she was in fear of Locke intentionally harming someone with the weapon.

The government suggests that Locke may have intended to use the weapon to enhance his reputation or credibility as a drug dealer. In other words, the theory is that Locke intended to send a message to others, through Caldwell and/or St. John, that he (Locke) was not a person to be trifled with in light of his firepower. But even if this theory is correct, it does not establish a "use" of the firearm that was an "operative factor" in the underlying transaction between Locke and Caldwell. Locke's use of the weapon as a means of facilitating future drug offenses is irrelevant for present purposes, because the only predicate offense tied to the § 924(c)(1) charge is the transfer of marihuana to Caldwell on December 22, 1994.

The government next hypothesizes that Locke may have sought to strike fear in Caldwell because of a suspicion that Caldwell was a government informant. However, there is no evidence whatsoever in the record that would suggest Locke had any suspicion or knowledge about Caldwell's activities with the police. In fact, the evidence suggests otherwise, because it would make little sense for Locke to knowingly give marihuana to a suspected police informant.

We conclude that the evidence here is legally insufficient to establish that Locke "used" the AK–47 within the meaning of *Bailey.*

### 2. "During and In Relation to a Drug Trafficking Crime"

■ Besides having to establish Locke's "use" of the AK–47, the government would have to demonstrate a use which was "during and in relation to" the predicate offense in order to sustain a conviction on Count IX. The latter phrase has been interpreted to mean that the firearm "must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith v. United States,* 508 U.S. 223, 238, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), *reh'g denied,* 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993). The firearm, in other words, must at least " 'facilitat[e] or ha[ve] the potential of facilitating' the drug trafficking offense." *Id.* (alterations in the original) (citation omitted).

For the reasons previously discussed above, the Court finds the evidence insufficient to establish use of a firearm "during and in relation to" the December 22, 1994 exchange of marihuana. Simply stated, nothing in the circumstances of that transaction suggests that Locke's handling or display of the AK–47 had any purpose or effect relative to the transfer of marihuana to Caldwell. Thus, we conclude that the evidence was legally insufficient to establish a use of the AK–47 "during and in relation to" Locke's transfer of marihuana to Caldwell on December 22, 1994.

## C.

In light of our determination that Count IX of the Superseding Indictment is legally insufficient, we must determine the proper remedy. In his original *pro se.* papers, Locke requested that his conviction and sentence under Count IX be vacated, that his stipulated sentence as to Counts I, VIII and XI be vacated, and that he be resentenced on Counts I, VIII, and XI in accordance with applicable law. Alternatively, Locke requested that his convictions on Counts I, VIII and XI be vacated. Since having obtained counsel, Locke has not seriously pursued this latter request but, in any event, the Court finds no basis for vacating his convictions on those counts. Accordingly, Locke's motion is denied to the extent he seeks to vacate his convictions on Counts I, VIII, and XI.

■ Nevertheless, Locke's motion for resentencing on Counts I, VIII and XI will be granted. It is now well-settled in this Circuit that, upon vacating a § 924(c)(1) conviction based upon a *Bailey* challenge, the district court has jurisdiction to resentence the defendant on the remaining unchallenged counts. *See United States v. Martin,* 116 F.3d 702, 704 (3d Cir.1997), *cert. denied,* 522 U.S. 939, 118 S.Ct. 351, 139 L.Ed.2d 273 (1997); *United States v. Davis,* 112 F.3d 118, 123 (3d Cir.1997), *cert. denied,* 522 U.S. 888, 118 S.Ct. 224, 139 L.Ed.2d 156 (1997). *Accord United*

*States v. Barron,* 172 F.3d 1153, 1158 (9th Cir.1999) (en banc); *United States v. Hillary,* 106 F.3d 1170, 1172 (4th Cir.1997); *United States v. Smith,* 103 F.3d 531, 534–35 (7th Cir.1996), *cert. denied,* 520 U.S. 1248, 117 S.Ct. 1861, 137 L.Ed.2d 1061 (1997). Re-sentencing is particularly appropriate here because it would appear the proposed sentence to which the parties stipulated may have been premised in part on the assumption that Locke would be classified as a "career offender" for sentencing purposes—an assumption that the government now apparently concedes is unfounded and which could arguably affect Locke's sentence.[10]

We also note that, pursuant to *United States v. Sally,* 116 F.3d 76 (3d Cir.1997), Locke has filed a motion for downward departure based on his alleged post-conviction rehabilitation efforts.[11] The government originally opposed this motion on jurisdictional grounds but, in light of our ruling on Locke's § 2255 motion, there is no jurisdictional defect to our consideration of the "*Sally* motion." Accordingly, at time of sentencing, the Court will consider the merits of that motion.

AND NOW, this ___ day of _____, 1999, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT

**10.** In its original papers in response to Locke's *pro se* § 2255 motion, the government represented that it had a basis to assert that Locke was a career offender pursuant to U.S.S.G. § 4B1.1, based on Locke's two prior felony drug convictions. (*See* Govt's Response to Petitioner's Mot. Pursuant to 28 U.S.C. § 2255 [Doc. No. 127] at 7.) Locke argues, and the government apparently now concedes, that this classification is erroneous because, under the Sentencing Guidelines, the two prior felony drug convictions would need to involve crimes of "possession ... with intent to manufacture, import, export, distribute or dispense." U.S.S.G. § 4B1.2. It appears that at least one of Locke's prior convictions involved simple possession only. However, we need not resolve this issue now, as any dispute on this point can be addressed at the time of Locke's re-sentencing.

**11.** Locke filed his initial "*Sally* motion" on July 7, 1997. (*See* Petitioner Locke's Downward Departure [Motion] Based on Petitioner's Post–Offense Rehabilitation Efforts [Doc. No. 131].) Subsequently, on May 7, 1998, Locke filed a document styled "Amendment to Petitioner's Downward Departure Based on Petitioner's Post–Offense Rehabilitation Efforts," [Doc. No. 138]. We will treat the latter as an amended "*Sally* motion" which supersedes and incorporates Locke's original motion for downward departure. Accordingly, the original "*Sally* motion" will be dismissed as moot and all of Locke's arguments and/or evidence relative to his motion for downward departure will be considered at time of re-sentencing.

1.) Petitioner Jay Harry Locke's Motion [Doc. No. 126] to Vacate Sentence under 28 U.S.C. § 2255 is GRANTED in part and DENIED in part as follows:

a) Locke's conviction and sentence under Count IX of the Superseding Indictment will be vacated;

b) Locke's convictions under Counts I, VIII, and XI will remain in tact, but his sentence as to those counts will be vacated.

2.) Petitioner's Motion [Doc. No. 131] for a Downward Departure will be denied as moot.

3.) Petitioner's Amended Motion [Doc. No. 138] for Downward Departure will be taken under advisement and addressed at time of sentencing.

IT IS FURTHER ORDERED that the Court will hold a telephonic status conference on _____, at _____ to discuss further proceedings in this case.