No. 94-3463
_____

United States of America,          *
                                   *
                Appellee,          *
                                   *
      v.                           *
                                   *
Jane Ellen Byrne, also known       *
as Peaches, Jane Sanchez,          *
Jane Mills, Jane Lehner, and       *
Rose Byrne,                        *
                                   *
                Appellant.         *

_____

No. 94-3744                          Appeals from the United States
_____                       District Court for the
                                    Eastern District of Missouri

United States of America,          *
                                   *
                Appellee,          *
                                   *
      v.                           *
                                   *
Anthony Luciano Santonelli,        *
                                   *
                Appellant.         *

                        _____

            Submitted:  September 12, 1995

               Filed:  May 14, 1996
                        _____

Before RICHARD S. ARNOLD, Chief Judge, and HEANEY and McMILLIAN,
     Circuit Judges.
                        _____

McMILLIAN, Circuit Judge.

Jane Ellen Byrne and Anthony Luciano Santonelli appeal from final judgments entered in the United States District Court[1] for the Eastern District of Missouri, upon jury verdicts finding them guilty of various drug trafficking and related offenses. For reversal, Byrne argues the district court erred in (1) finding her statement was voluntary, (2) admitting audiotapes and transcripts of certain in-person and telephone conversations, (3) refusing to compel disclosure of the tape-recording and written report about an undercover meeting, (4) admitting testimony that no one had submitted an administrative claim for certain cash seized at the time of her arrest, and (5) calculating her criminal history category and the drug quantity for purposes of sentencing. For reversal, Santonelli argues the district court erred in (1) refusing to compel disclosure of certain grand jury transcripts, (2) denying his request to subpoena witnesses to testify on his behalf at sentencing, and (3) calculating the drug quantity for purposes of sentencing. For the reasons discussed below, we affirm Byrne's conviction and sentence as to counts 1, 6 and 9 and remand her case to the district court as to count 8 for further proceedings in light of Bailey v. United States, 116 S. Ct. 501 (1995). We affirm Santonelli's conviction on all counts, but vacate his sentence and remand his case to the district court for resentencing.

BACKGROUND FACTS

In September 1993 a confidential informant told local police that Santonelli was selling heroin. An undercover officer was assigned to investigate. The undercover officer met Santonelli and made arrangements to buy heroin from him. The undercover officer recorded their telephone calls and conversations.

---

[1]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

On September 30, 1993, the undercover officer met Santonelli at a local restaurant parking lot. Santonelli sold the undercover officer 8 capsules of heroin and 2 capsules of cocaine. Santonelli gave the undercover officer his home telephone number and the beeper number of a "girl" named "Peaches" who Santonelli said worked for him.

On October 5, 1993, the undercover officer tried to contact Santonelli but was unable to reach him by telephone. The undercover officer called the beeper number. The beeper was answered by "Peaches." At that time the undercover officer did not know who "Peaches" was. According to the government's theory of the case, Byrne was "Peaches." The undercover officer asked Byrne to contact Santonelli. Byrne agreed to do so. Santonelli later contacted the undercover officer and set up another drug transaction at another restaurant parking lot. The undercover officer waited at the parking lot, but Santonelli did not appear. The undercover officer called Santonelli and arranged to meet him at an apartment complex. The undercover officer met Santonelli as arranged and bought 10 capsules of heroin from him.

The next day, October 6, 1993, the undercover officer and Santonelli arranged another drug transaction at the apartment complex. The undercover officer bought 10 more capsules of heroin from him.

On October 19, 1993, the undercover officer called Santonelli at home but was unable to reach him. The undercover officer called the beeper number. Byrne answered the beeper and agreed to meet the undercover officer at a third restaurant parking lot. Byrne apparently contacted Santonelli because Santonelli called the undercover officer and they arranged to meet at a supermarket parking lot, where the undercover officer bought 10 more capsules of heroin from him.

On February 1, 1994, Drug Enforcement Administration (DEA) special agent Richard Bauer discussed the investigation with the local police and, on the basis of the information he received about the investigation, obtained a search warrant for Byrne's apartment. The search warrant was executed the next day (February 2). The undercover officer was present. The agents knocked on the door and announced their presence and purpose but heard no answer. They forcibly entered the apartment and found Byrne in the living room surrounded by illegal drugs and drug paraphernalia in plain view, including heroin, cocaine, crack, a digital scale, and a hand-held scale. The agents also found drug packaging materials, a triple-beam balance scale, and a cutting agent (lactose). In addition, the agents also found three firearms within Byrne's reach, certain documents in Santonelli's name and papers that the agents described as "drug notes."

The undercover officer (who was a woman) took Byrne into the kitchen and searched her person but found no drugs or other evidence. Byrne asked the undercover officer if she could get something to drink out of the refrigerator. The undercover officer agreed. Byrne then drank a small amount of a yellowish liquid. The undercover officer became alarmed that Byrne might have swallowed "evidence" or something poisonous and, with the assistance of the other agents, tackled Byrne to the floor and handcuffed her. Byrne told the agents that the liquid was methadone and refused medical treatment. Byrne was advised of her Miranda[2] rights.

About a hour later the agents took Byrne to the local DEA office. She was again advised of her Miranda rights. According to Bauer, Byrne understood her rights, appeared to be unaffected by the methadone, and agreed to cooperate with the investigation. Byrne again refused medical attention. She then made a statement

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

-4-

in which she identified Santonelli as one of her heroin sources (his name was redacted from the statement at trial) and described her drug distribution activities in detail, including estimates of the amounts of heroin and cocaine she distributed weekly. Byrne was then released.

Santonelli was arrested later that same night (February 2) on unrelated charges and was incarcerated pending trial.

On February 24, 1994, Byrne and Santonelli were indicted by a federal grand jury and charged with conspiracy to distribute and possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 846. Santonelli was charged with distribution of heroin or cocaine or both, in violation of 21 U.S.C. § 841(a) (counts 2-5, 7). Byrne was charged with using a communication facility to facilitate distribution of heroin, in violation of 21 U.S.C. § 843(b) (count 6), possession and use of firearms in connection with drug trafficking, in violation of 18 U.S.C. § 924(c) (count 8), and unlawful firearms possession, in violation of 18 U.S.C. § 922(g) (count 9).

On March 3, 1994, Byrne was arrested at another address, again surrounded by drug paraphernalia, including drug notes, scales and about $1300 in cash in her purse.

Pretrial suppression motions, including Byrne's motion to suppress her statement made to the DEA, were denied. The magistrate judge[3] found that the statement was voluntary. At trial, Santonelli testified in his own defense; Byrne did not. Santonelli conceded his participation in the drug transactions, but he denied any involvement in any conspiracy. Bauer testified that the cash found in Byrne's purse at the time of her arrest on

---

[3]The Honorable Lawrence O. Davis, United States Magistrate Judge for the Eastern District of Missouri.

-5-

March 3 represented drug proceeds and described the administrative forfeiture process. As part of his testimony about the forfeiture process, Bauer testified that no one had submitted a claim for the cash. A jury found Byrne and Santonelli guilty on all counts.

Santonelli became dissatisfied with his appointed defense attorney and represented himself at sentencing. (The district court appointed the former defense attorney as Santonelli's legal advisor.) On October 21, 1994, the district court considered and denied the defense motion to subpoena certain witnesses to testify at the sentencing hearing. On October 28, 1994, the district court considered and denied Santonelli's objections to the presentence report, including his objections to the calculation of the drug quantities attributable to him.

The district court sentenced Byrne to a total of 197 months imprisonment (137 months for conspiracy plus 60 months, to be served consecutively, for the possession and use of a firearm in connection with drug trafficking), 4 years supervised release, a fine of $1800, and a special assessment of $200. The district court sentenced Santonelli to a total of 175 months imprisonment, 4 years supervised release, a fine of $1500, and a special assessment of $300. These appeals followed.

VOLUNTARINESS OF STATEMENT

Byrne first argues the district court erred in denying her motion to suppress her statement made during custodial interrogation by DEA agents and others. Byrne argues that her statement was not voluntary because she was under the influence of a narcotic (methadone) at the time. She also argues the circumstances were inherently coercive because the interrogation room was very small and because the agents physically intimidated her, denied her needed medical treatment, and threatened to arrest her if she did not cooperate. Byrne argues that the fact that the

-6-

interrogation was not tape-recorded or video-taped is suspicious and that her appearance and behavior would have clearly supported her claim that she was under the influence of methadone at the time.

Although we review the district court's factual findings for clear error, we review de novo the ultimate determination that Byrne voluntarily made the statement. E.g., United States v. Makes Room, 49 F.3d 410, 414 (8th Cir. 1995) (noting same standard applied to assess validity of Miranda waiver and voluntariness of statement under fifth amendment). We consider, as did the district court, the totality of the circumstances in order to determine whether the accused's will was overborne. Id. We hold the district court did not err in finding that Byrne voluntarily made the statement. Assuming for purposes of analysis that the unknown liquid was in fact methadone, the DEA agent testified that the methadone did not appear to have affected Byrne and that she refused an offer of medical attention. According to the DEA agent, Byrne was coherent, composed and cooperative, although somewhat subdued, during the interrogation. She stated that she understood her Miranda rights and agreed to answer the investigators' questions; she was not promised anything or threatened and was released from custody shortly after she made the statement.

AUDIOTAPES AND TRANSCRIPTS

Byrne next argues the district court abused its discretion in admitting the audiotapes and transcripts of in-person and telephone conversations between the undercover officer and Santonelli because there was inadequate foundation establishing their authenticity. Four of the audiotapes were recordings of drug transactions between the undercover officer and Santonelli (on September 30 and October 5, 6 and 19); the fifth tape contained 10 telephone conversations between the undercover officer and either Byrne or Santonelli. There are some gaps on the audiotapes and in the transcripts.

Byrne argues the audiotapes could have been altered or modified and thus did not accurately reflect the conversations.

We review questions involving the admissibility of evidence, including tape-recordings, for abuse of discretion. E.g., United States v. Roach, 28 F.3d 729, 732-34 (8th Cir. 1994) (videotapes), citing United States v. McMillan, 508 F.2d 101 (8th Cir. 1974) (discussing guidelines for admitting audiotapes), cert. denied, 421 U.S. 916 (1975). We hold the district court did not abuse its discretion in admitting the audiotapes and transcripts. The existence of the audiotapes establishes that the recording equipment was functioning properly and that the individual who made the audiotapes was sufficiently skilled in the operation of the recording equipment. United States v. Roach, 28 F.3d at 733. The undercover officer who participated in the drug transactions and the telephone calls identified the speakers on the audiotapes, described how the audiotapes had been made, handled and stored, and how the audiotapes had been reviewed against the transcripts, and stated that the audiotapes had not been modified, edited or altered. The audiotapes themselves, the undercover officer's testimony and the absence of any evidence that the audiotapes had been mishandled or otherwise tampered with established an adequate foundation for the admission of the audiotapes and the transcripts. The gaps in the audiotapes and the transcripts affected the weight of the evidence, not its admissibility.

FAILURE TO COMPEL DISCLOSURE OF CONVERSATION AND WRITTEN REPORT

The indictment alleged that the conspiracy began sometime in September 1993 but all the acts of distribution or other violations occurred on or after September 30, 1993. However, the undercover officer met Santonelli once before September 30, 1993, in the company of another undercover agent and a confidential informant. The meeting was tape-recorded, and the undercover officer also prepared a written report about the meeting. The audiotape and the

written report were not disclosed during discovery pursuant to Fed. R. Crim. P. 16 or as Jencks Act material following the undercover officer's testimony pursuant to 18 U.S.C. § 3500. Byrne argues the district court should have compelled disclosure of the audiotape and the written report (and at the very least should have examined the audiotape and the written report in camera before so ruling).

This issue involves what are essentially discovery matters which we review for abuse of discretion. E.g., United States v. Dijan, 37 F.3d 398, 402 (8th Cir. 1994) (Jencks Act material), cert. denied, 115 S. Ct. 1418 (1995); United States v. Roach, 28 F.3d at 734 (Fed. R. Crim. P. 16). Under the Jencks Act a criminal defendant is entitled to obtain, after the direct testimony of a government witness, prior statements of the witness which relate to the subject matter as to which the witness has testified. We hold the district court correctly refused to compel disclosure of the audiotape and the written report as Jencks Act material because the pre-September 30 meeting was not the subject of the undercover officer's direct examination testimony and was only collateral or background information. E.g., United States v. Pacelli, 491 F.2d 1108, 1120 (2d Cir.) (statements which are strictly collateral to subject of testimony or only peripherally related are not producible under Jencks), cert. denied, 419 U.S. 826 (1974). We also hold the district court correctly refused to compel disclosure of the audiotape and the written report under Fed. R. Crim. P. 16. The audiotape and the written report were not written or recorded statements made by Byrne or a written record containing the substance of any relevant oral statement made by Santonelli in response to interrogation by any person then known to him as a government agent, Fed. R. Crim. P. 16(a)(1)(A), and were not intended for use by the government as evidence in chief at the trial, Fed. R. Crim. P. 16(a)(1)(C). In addition, disclosure would have revealed the identity of the confidential informant. See United States v. Roach, 28 F.3d at 734 (non-witness confidential informant).

COMMENT ON BYRNE'S RIGHT TO REMAIN SILENT

Byrne next argues the district court erred in admitting the DEA agent's testimony referring to the fact that no one had submitted an administrative claim for the cash found in her purse at the time of her arrest because it was an improper comment on her post-arrest silence. The cash had been seized as drug proceeds and was subject to administrative forfeiture. The DEA agent's testimony about the administrative forfeiture process came out on re-direct, following cross-examination questions inferring that the purse in which the cash was found could have belonged to one of the other occupants of the apartment. The DEA agent explained that persons can submit claims for the return of seized property even after the specified deadlines for doing so, but that a claim can be denied because the seized property is drug proceeds. On re-direct examination, the DEA agent testified that certain documents found in the purse in which the cash was found connected the purse to Byrne.

We hold the district court did not abuse its discretion in admitting this testimony. We do not think the DEA agent's reference to the fact that no one had submitted an administrative claim for the cash found in Byrne's purse constituted an indirect comment calculated to call attention to Byrne's post-arrest silence or that the jury would have naturally regarded it as a comment on her post-arrest silence. Cf. United States v. Montgomery, 819 F.2d 847, 853 (8th Cir. 1987) (whether prosecutor's closing argument constituted improper comments on defendant's failure to testify). The reference was indirect and had been elicited on re-direct in order to clarify why the DEA agent believed the cash represented drug proceeds and why the purse belonged to Byrne and not to one of the other occupants of the apartment. The reference also rebutted the inference that Byrne did not file a claim for the cash only because she did not receive timely notice of the forfeiture proceedings.

The district court excluded a prior conviction and sentence and calculated Byrne's criminal history category at level IV. The applicable guideline sentencing range was 110-137 months. The district court sentenced Byrne to 137 months imprisonment "because of [Byrne's] past involvement in criminal activity." Because the 137-month sentence falls within the applicable guideline sentencing range at criminal history category level V (130-162 months), Byrne argues the 137-month sentence indicates that the district court in fact improperly considered the prior conviction and effectively sentenced her at criminal history category level V. We disagree. Byrne's analysis of the district court's reasons for imposing sentence is wholly speculative and is not supported by the record.

Byrne also argues the district court improperly adopted the estimates of drug quantity contained in the presentence report. The drug quantities were calculated on the basis of Byrne's statement that she distributed 10 grams of heroin and 21 grams of cocaine per week during the conspiracy (September 1993 through February 24, 1994). She argues the district court should have excluded any drugs attributable to transactions during the month of September 1993 because there was no evidence of any drug trafficking before September 30, 1993. We hold the district court did not err in including the month of September 1993 in calculating the quantity of drugs. E.g., United States v. Roach, 28 F.3d at 735 (drug quantity findings reviewed for clear error). The evidence showed that the conspiracy was in existence in September 1993.

Finally, we note that in count 8 Byrne was convicted of the use of three firearms during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). These firearms were found about 2 feet from Byrne, on the floor near the sofa on which she had been sitting, during the February 1994 search of her

apartment. This appeal was argued in September 1995; subsequently, in December 1995, the Supreme Court in <u>Bailey v. United States</u>, 116 S. Ct. 501, 506 (1995), clarified that the meaning of the term "use" in 18 U.S.C. § 924(c) requires "active employment." The district court has not had an opportunity to consider the <u>Bailey v. United States</u> issue. For that reason, although we affirm Byrne's conviction as to counts 1, 6 and 9, we remand her case as to count 8 to the district court for further proceedings in light of <u>Bailey v. United States</u>.

GRAND JURY MATERIALS

Santonelli argues that he was denied due process because the district court denied his request to disclose certain grand jury transcripts. Santonelli argues that the grand jury transcripts contained potentially exculpatory material. The government's attorney reviewed the substance of the grand jury testimony in question with the district court out of the hearing of the jury; this portion of the trial transcript was then sealed. The district court denied disclosure on the ground that the grand jury transcripts at issue were not exculpatory and thus not <u>Brady</u>[4] material. This court has reviewed the sealed trial transcript, and we agree with the district court that the grand jury transcripts at issue are not exculpatory and thus not subject to disclosure under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>See Layton v. South Dakota</u>, 918 F.2d 739, 742 (8th Cir. 1990) (court of appeals reviewed in camera witness statements and agreed with district court that they contained no <u>Brady</u> material), <u>cert. denied</u>, 499 U.S. 953 (1991).

REQUEST TO SUBPOENA WITNESSES FOR SENTENCING

Santonelli argues the district court erred in denying his request to subpoena Byrne, the undercover officer and the DEA agent

---

[4]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

to testify at the sentencing hearing.  Santonelli wanted to question them about the different drug quantities referred to in trial testimony and in their statements in the presentence report.  For example, he argues that Byrne's statement about the drug quantities involved in the conspiracy increased the base offense level from 12 (less than 5 grams of heroin; maximum 37 months imprisonment) to base offense level 28 (maximum 175 months imprisonment), a five-fold increase.  He acknowledges that in general the right of confrontation does not apply to sentencing but argues that his case falls within the narrow due process exception recognized in United States v. Wise, 976 F.2d 393, 401 (8th Cir. 1992) (banc) (relevant conduct greatly enhanced sentence), cert. denied, 507 U.S. 989 (1993).

We hold the district court did not abuse its discretion in denying the request to subpoena witnesses to testify at the sentencing hearing.  First, this is not the kind of case contemplated by United States v. Wise.  Santonelli and Byrne were convicted of a drug-trafficking conspiracy, and Byrne's statement about the drug quantities involved in the conspiracy did not so greatly increase the sentence that would have otherwise been imposed so as to trigger due process concerns.  The undercover officer and the DEA agent testified at trial about Byrne's statement and were subject to thorough cross-examination.  In addition, Byrne had indicated through defense counsel that, if subpoenaed, she would have invoked her fifth amendment privilege and refused to testify.

SENTENCING-- SANTONELLI

Santonelli argues the district court improperly adopted the presentence report's calculation of the drug quantities attributable to him.  We review the district court's drug quantity findings under the clearly erroneous standard of review.  E.g., United States v. Roach, 28 F.3d at 735.  Because we agree with one

of Santonelli's arguments, we vacate his sentence and remand the case to the district court for resentencing.

Santonelli argues the district court erred in attributing to him the drugs seized in Byrne's apartment at the time of her arrest on March 3, 1994, because he had been in custody since his arrest on February 2, 1994. The government's attorney stated that it was his understanding that those drugs had not been included in the presentence report's calculations but that, even if those drugs were excluded from the calculations, Santonelli's offense level would not change.[5] This information was not correct. The presentence report calculation of drug quantity did include these drugs and their inclusion did change the offense level. Including the drugs seized from Byrne's apartment at the time of her arrest on March 3, 1994, 2.7 grams of heroin and 2.5 grams of cocaine, increased the total drug quantity attributable to Santonelli to slightly more than 400 kilograms of marijuana equivalents and thus increased the offense level from 26 to 28. Because the sentence may have been affected by this incorrect information, we vacate Santonelli's sentence and remand the case to the district court for resentencing.

We do not agree with Santonelli's other arguments and address them briefly. Like Byrne, Santonelli also argues the district court should have excluded any drugs attributable to transactions during the month of September 1993 because there was no evidence of any drug trafficking before September 30, 1993. We hold the district court did not err in including the month of September 1993 in calculating the quantity of drugs. The evidence showed that the conspiracy was in existence in September 1993.

---

[5]This representation was based on mistaken information from the probation officer. Brief for Appellee at 43-44 n.15.

Santonelli also argues the 1.6 grams of crack cocaine found in Byrne's apartment at the time of her arrest should not have been attributed to him. He argues there was no evidence that the crack cocaine was part of the conspiracy and that it was more likely Byrne's personal supply. Including the crack cocaine increased the total drug quantity to slightly more than the 400-kilogram minimum of marijuana equivalents required for offense level 28. U.S.S.G. § 2D1.1(c)(6). We cannot say including the crack cocaine in the calculation of drug quantity was clearly erroneous. It was reasonably foreseeable that crack cocaine, a form of cocaine, would be distributed by the members of a conspiracy that distributed heroin and cocaine.

Santonelli also argues that the presentence report "double-counted" in calculating the drug quantity because the probation officer added the 5.4 grams of cocaine and the 7.78 grams of heroin seized from Byrne's apartments to the estimate of 10 grams of heroin and 21 grams of cocaine per week for the 25-week duration of the conspiracy. He argues that the drugs actually seized should have been subtracted from, not added to, the estimated quantity. Assuming for purposes of analysis that it was "double-counting" to add the drugs actually seized to the estimated quantity of drugs based on Byrne's statement, we hold that the error was harmless. The presentence report calculated the total drug quantity involved in the conspiracy on the basis of smaller amounts than Byrne reported in her statement (10 grams of heroin per week rather than 10.5 grams, a difference of 12.5 grams over the 25-week conspiracy). That difference alone would substantially offset the double-counting. In addition, the presentence report did not include the drugs represented by the money seized in the calculation of the total drug quantity or any enhancements for transactions near a protected location or obstruction of justice in the calculation of the offense level. Including these factors would have more than offset the double-counting.

Santonelli also argues that the district court should not have attributed distribution of 21 grams of cocaine per week to him because there was no evidence that Byrne's cocaine distribution was reasonably foreseeable to him.  He argues that he actually sold less than 1 gram of cocaine to the undercover officer and that Byrne had identified him only as one of her two sources of heroin, not cocaine.  We cannot say attributing to Santonelli the cocaine distributed by Byrne was clearly erroneous.  Byrne's distribution of cocaine was conduct reasonably foreseeable as part of the conspiracy.

Accordingly, we affirm Byrne's conviction and sentence as to counts 1, 6 and 9.  As to count 8, we remand her case to the district court for further proceedings in light of Bailey v. United States.  We affirm Santonelli's conviction on all counts, vacate his sentence and remand his case to the district court for resentencing.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.