# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## DEPARTMENT OF TALENT & ECONOMIC DEVELOPMENT/UNEMPLOYMENT INSURANCE AGENCY v GREAT OAKS COUNTRY CLUB, INC

Docket No. 160638. Argued on application for leave to appeal March 4, 2021. Decided June 7, 2021.

This case stemmed from a dispute over the unemployment-insurance tax rate applicable to Great Oaks Country Club, Inc (Great Oaks). All employers subject to the Michigan Employment Security Act (the MESA), MCL 421.1 *et seq*., are responsible for paying unemployment-insurance taxes to the Department of Talent and Economic Development/Unemployment Insurance Agency (the Agency). The Agency determined that Great Oaks was not entitled to the new-employer tax rate under the MESA, specifically MCL 421.13m(2)(a)(*i*)(A) and (B). Under MCL 421.19, an employer is taxed either at the new-employer rate or at a calculated, experienced-employer rate based on its unemployment experience. Before January 1, 2011, Great Oaks became a client employer of a Professional Employer Organization (PEO) that operated in Michigan. In 2011, statutory changes became effective that required client-level reporting by PEOs. Because Great Oaks was a client employer of a PEO before 2011, it was not required to change its reporting method until January 1, 2014. It was undisputed that Great Oaks had been a client employer of the PEO for at least 8 quarters as of January 1, 2014, and that Great Oaks had reported no employees or payroll for those same 8 quarters. It was also undisputed that Great Oaks's PEO did not change its reporting method until January 1, 2014. Great Oaks protested the Agency's determination that Great Oaks was not entitled to the new-employer tax rate. The Agency rejected Great Oaks's protests, and Great Oaks appealed to an administrative law judge (ALJ). The ALJ determined that because Great Oaks had 8 quarters of no employment or payroll before January 1, 2014, it was entitled to the new-employer tax rate. The ALJ further ruled that the phrase "beginning January 1, 2014" in MCL 421.13m(2)(a)(*i*)(A) and (B) was the date by when a client employer must have accrued 8 quarters of not reporting employees or payroll. The Agency appealed the ALJ's decision in the Michigan Compensation Appellate Commission (the MCAC), and the MCAC affirmed the ALJ's decision. The Agency appealed the MCAC's decision in the Oakland Circuit Court, and the court, Nanci J. Grant, J., affirmed the MCAC's decision. The Agency appealed in the Court of Appeals. The Court of Appeals, MURRAY, C.J., and METER and FORD HOOD, JJ., held that Great Oaks was not entitled to the new-employer tax rate, interpreting MCL 421.13m(2)(a)(*i*)(A) and (B) to require Great Oaks to have reported no employees or payroll for a period of 12 or more calendar quarters to qualify for the new-employer tax rate. 329 Mich App 581 (2019). In so holding, the Court of Appeals rejected Great Oaks's interpretation that a

client employer must have accrued the relevant number of calendar quarters in which it reported no employees or payroll by January 1, 2014, to be assessed the new-employer tax rate and instead adopted the Agency's interpretation that a client employer must have switched to client-level reporting before January 1, 2014, to be assessed the new-employer tax rate. Great Oaks moved for reconsideration, which the Court of Appeals denied. Great Oaks sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 505 Mich 1056 (2020).

In a unanimous opinion by Justice ZAHRA, the Supreme Court, in lieu of granting leave to appeal, *held*:

Employers liable for paying unemployment-insurance taxes are required to file quarterly tax reports with the Agency, and some employers utilize PEOs to file these reports. Before 2011, a PEO could report a client's payroll under the PEO's own unemployment account rather than the client employer's. But with the enactment of 2010 PA 370, PEOs were required to report the payroll information under the client employer's unemployment account beginning January 1, 2014. This practice is known as "client-level reporting," and reporting in this fashion was discretionary beginning January 1, 2011, but became mandatory as of January 1, 2014. When 2010 PA 370 was passed, the Legislature also changed how the unemployment tax rate is calculated for client employers with the enactment of 2010 PA 383. Although the PEO remains the employer liable for paying unemployment-insurance contributions, the unemployment tax rate is no longer based on the PEO's prior account and experience. Rather, beginning January 1, 2014, for purposes of calculating unemployment tax rates, the calculation is based on the number of years the client employer is deemed to have employed a staff, either directly or through the PEO, and each client employer is taxed at its own rate. MCL 421.13m, which was enacted into law on January 1, 2011, governs the applicable unemployment tax rate for PEOs and their client employers. MCL 421.13m was amended in 2011 by 2011 PA 269 and again in 2012 by 2012 PA 219. MCL 421.13m(2)(a)(*i*)(A) currently provides, in pertinent part, that if the client employer reported no employees or no payroll to the Agency for 8 or more calendar quarters or, beginning January 1, 2014, for 12 or more calendar quarters, the client employer's unemployment tax rate will be the new-employer tax rate. MCL 421.13m(2)(a)(*i*)(B) currently provides that if the client employer was a client employer of the PEO for less than 8 calendar quarters or, beginning January 1, 2014, for less than 12 calendar quarters, the client employer's unemployment tax rate will be based on the client employer's prior account and experience. MCL 421.13m(2)(a)(*ii*) provides that a business entity that is a contributing employer and becomes a client employer of the PEO on or after January 1, 2014, shall retain its existing unemployment tax rate or establish a new rate as provided in MCL 421.19. Finally, MCL 421.13m(2)(b) provides that a PEO that is a liable employer and that was operating in this state before January 1, 2011, may elect and use the reporting method in MCL 421.13m(2)(a) before January 1, 2014, but shall report using the method in MCL 421.13m(2)(a) on and after January 1, 2014. In this case, Great Oaks's interpretation—not the Agency's interpretation—was correct: MCL 421.13m(2)(a)(*i*)(A) and (B) require a client employer to have accrued the relevant number of calendar quarters in which it reported no employees or payroll by January 1, 2014, to be assessed the new-employer tax rate. Because Great Oaks reported no employees or payroll for 8 consecutive calendar quarters before January 1, 2014, Great Oaks was entitled to be assessed the new-employer tax rate. Section 13m(2)(a)(*i*)(A) refers to some number of calendar quarters—8 or 12—in which the client employer reported no employees or no payroll to the agency; crucially, nowhere does it speak of a reporting *method* the

way that MCL 421.13m(2)(b) does. Thus, when MCL 421.13m(2)(a)(*i*)(A) is read alongside MCL 421.13m(2)(b), giving effect to each, the phrase "beginning January 1, 2014" in MCL 421.13m(2)(a)(*i*)(A) refers to the date by when a certain number of nonreporting quarters must have been accrued, not to the date by when the switch to the method of client-level reporting occurred. If the Legislature had wanted MCL 421.13m(2)(a)(*i*)(A) to govern the assessment of a certain tax rate for client employers based on when they switched to the *method* of client-level reporting, it could have included language to that effect in MCL 421.13m(2)(a)(*i*)(A). But it did not. Instead, it provided only for the assessment of a certain tax rate to client employers based on a certain *number* of nonreporting quarters accrued by a certain date, namely, January 1, 2014. Similarly, MCL 421.13m(2)(a)(*i*)(B) also refers only to some *number* of quarters, not a reporting *method*, vis-à-vis the appropriate tax rate to be assessed to client employers. As with MCL 421.13m(2)(a)(*i*)(A), in MCL 421.13m(2)(a)(*i*)(B), "January 1, 2014" functions as a cut-off date. Reading the subsections together, MCL 421.13m(2)(a)(*i*)(A) delineates under what circumstances a client employer like Great Oaks is entitled to the new-employer tax rate. MCL 421.13m(2)(a)(*i*)(B) then fills in the rest of the picture, clarifying that a client employer is to be assessed an experienced-employer tax rate if the client employer was a client employer of the PEO for less than 8 calendar quarters or, beginning January 1, 2014, for less than 12 calendar quarters. As with MCL 421.13m(2)(a)(*i*)(A), MCL 421.13m(2)(a)(*i*)(B) does not speak of a reporting *method* but, rather, of a certain *number* of quarters in which the client employer was in a relationship with its PEO, with January 1, 2014, serving as the cut-off date for the relevant number of quarters needed for assessment of the experienced-employer tax rate. For MCL 421.13m(2)(a)(*i*)(A) to mean what the Agency contends it means, it would have to say something about a reporting method, not just that not reporting employees or payroll must occur for a certain number of quarters "beginning January 1, 2014." And for MCL 421.13m(2)(a)(*i*)(B) to mean what the Agency contends it means, it likewise would need to say something about a reporting method, not just that a relationship between a client employer and its PEO for a certain number of quarters corresponds to a certain tax rate. Further, the amendments to MCL 421.13m that were made in 2011 and 2012—which changed "8" to "12" and then restored "8," all within 18 months of the enactment of MCL 421.13m—indicate that the purpose of the 2012 amendment was remedial, intended to undo the 2011 amendment's erasure of the 8-quarter safe-harbor condition so that client employers like Great Oaks under the facts of the instant case would receive the new-employer tax rate under MCL 421.13m. The Court of Appeals in this case failed to account for the exclusive, mandatory nature of MCL 421.13m; the Court of Appeals' interpretation of MCL 421.13m and MCL 421.19 rendered MCL 421.19 nugatory. The insertion of the clause "or, beginning January 1, 2014, for 12 or more calendar quarters" placed PEOs governed by MCL 421.13m on even footing with the 12-quarter scheme in place for all other employers governed by MCL 421.19 after the transition period—i.e., the time prior to January 1, 2014—concluded, and the statutory history supported this reading: MCL 421.19, which was amended at the same time as MCL 421.13m by 2011 PA 269, was amended in that way to bring the standards governing non-PEO-using employers subject to MCL 421.19 into conformity with those standards governing PEO-using client employers subject to MCL 421.13m. In sum, because Great Oaks used a PEO and reported no employees or payroll to the Agency for 8 quarters prior to January 1, 2014, Great Oaks was entitled to the new-employer tax rate.

Court of Appeals opinion reversed and case remanded to the Agency for entry of a decision assessing Great Oaks the new-employer tax rate under MCL 421.13m.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED June 7, 2021

STATE OF MICHIGAN

SUPREME COURT

DEPARTMENT OF TALENT &
ECONOMIC
DEVELOPMENT/UNEMPLOYMENT
INSURANCE AGENCY,

        Plaintiff-Appellee,

v

                                    No. 160638

GREAT OAKS COUNTRY CLUB, INC.,

        Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

ZAHRA, J.

This appeal arises from a relationship between an employer, defendant-appellant Great Oaks Country Club, Inc. (Great Oaks), and a Professional Employer Organization

(PEO).[1] We are called upon to determine, in the context of this relationship, Great Oaks's unemployment-insurance tax rate under the Michigan Employment Security Act (the MESA), MCL 421.1 *et seq*., specifically MCL 421.13m(2)(a)(*i*)(A) and (B).[2] The Court of Appeals interpreted Section 13m to require Great Oaks to have reported "no employees or no payroll" for a period of 12 or more calendar quarters to qualify for the lower "new employer tax rate" under the MESA. The Court of Appeals adopted the interpretation of Section 13m offered by plaintiff-appellee, the Department of Talent and Economic Development/Unemployment Insurance Agency (the Agency), which maintained that a client employer must have switched to client-level reporting before January 1, 2014, to be assessed the new-employer tax rate (the conversion-date interpretation).[3] We disagree. We hold that, in this context, Section 13m is best understood according to the interpretation offered by Great Oaks: that a client employer must have accrued the relevant number of

---

[1] A PEO is often referred to as an employee-leasing company. PEOs contract with small to mid-sized employers to perform certain administrative functions for them. Employers that use the services of PEOs are known as "client employers" under the Michigan Employment Security Act (the MESA), MCL 421.1 *et seq*. These contractual arrangements permit the PEO, as a coemployer, to combine the employee benefits of several client employers to offer the client employers increased efficiencies and reduced costs. See Mich Admin Code, R 421.190(1)(d).

[2] This opinion will refer to MCL 421.13m as "Section 13m."

[3] In 2011, the Legislature enacted the Michigan Professional Employer Organization Regulatory Act (the PEO Act), MCL 338.3721 *et seq*. The enactment of the PEO Act is significant not only because it interacts with the MESA in this case but also because the effective date of Section 13m was expressly conditioned on its passage. Generally stated, the PEO Act requires PEOs to report information under each of their client employer's unemployment-insurance accounts instead of the PEO's own account. This practice is referred to as client-level reporting. See MCL 421.13m(2)(b).

2

calendar quarters in which it reported "no employees or no payroll" by January 1, 2014, to be assessed the new-employer tax rate (the accrual-date interpretation). And because Great Oaks reported no employees or payroll for 8 consecutive calendar quarters before January 1, 2014, we hold that Great Oaks is entitled to be assessed the new-employer tax rate under Section 13m of the MESA. Accordingly, we reverse the Court of Appeals' decision and remand to the Agency for further proceedings consistent with this opinion.

Because the proper resolution of this case rests so heavily on the interaction between the MESA, Section 13m, and the PEO Act, as well as subsequent amendments, we first review the statutory scheme and its relevant statutory history before presenting the basic facts and procedural history of this case.

## I. THE MESA

All employers subject to the MESA are responsible for paying unemployment-insurance taxes, or contributions, to the Agency.[4] The Agency places these contributions into the unemployment-compensation fund.[5] From this fund, the Agency pays unemployment benefits to eligible and qualified workers.[6] Benefits paid to claimants are charged against an employer's account.[7] Under MCL 421.19 (Section 19), an employer is taxed either at the new-employer rate or at a calculated, experienced-employer rate based

---

[4] MCL 421.13(1).

[5] MCL 421.26(a).

[6] MCL 421.26(c)(1).

[7] MCL 421.20(a).

on its unemployment experience.[8]  Therefore, the more an employer's former workers are awarded unemployment benefits, the higher its tax rate will be.[9]

Liable employers are required to file quarterly tax reports with the Agency, and some employers utilize PEOs to file these reports.[10]  Prior to 2011, a PEO could report a client's payroll under the PEO's own unemployment account rather than the client employer's.  But with the enactment of the PEO Act in 2011,[11] PEOs were required to report the payroll information under the client employer's unemployment account beginning January 1, 2014.[12]  This practice is known as "client-level reporting," and

---

[8] See generally MCL 421.19.

[9] See *id*.

[10] See MCL 421.13m(2)(a).  As explained by the Court of Appeals, see *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Ambs Message Ctr, Inc*, 329 Mich App 581; 944 NW2d 125 (2019) (*Ambs Message Ctr*), a PEO can be thought of as somewhat of a shell entity that has no underlying business other than to provide payroll, payment of unemployment-insurance obligations, and other human-resources services on behalf of its various client employers:

> Under a typical service agreement, a business transfers its employees to the professional employer organization, which then leases the employees back to the business.  The leased employees are treated as the employees of the professional employer organization even though the original employer (now considered the client employer) maintains day-to-day control over the employees.  The professional employer organization normally handles all of the human resource matters involving the employees, including paying the unemployment insurance obligations related to the payroll of the client employer.  [*Id.* at 585.]

[11] See 2010 PA 370, effective July 1, 2011.

[12] MCL 421.13m(2)(a) and (b).

4

reporting in this fashion was discretionary beginning January 1, 2011, but became mandatory as of January 1, 2014.[13]

When the PEO Act was passed, the Legislature also changed how the unemployment tax rate is calculated for client employers.[14] Although the PEO remains the employer liable for paying unemployment-insurance contributions, the unemployment tax rate is no longer based on the PEO's prior account and experience.[15] Rather, beginning January 1, 2014, for purposes of calculating unemployment tax rates, the PEO is taken out of the picture and the calculation is based on the number of years the client employer is deemed to have employed a staff, either directly or through the PEO, and each client employer is taxed at its own rate.[16]

## II. STATUTORY HISTORY OF SECTION 13M AND TEXT OF OTHER KEY PROVISIONS

Section 13m is a subsection of the MESA and was enacted into law on January 1, 2011,[17] at the same time as the PEO Act.[18] Section 13m governs the applicable

---

[13] MCL 421.13m(2)(b).

[14] See 2010 PA 383, effective January 1, 2011.

[15] MCL 421.13m(2)(a).

[16] MCL 421.13m(2)(b).

[17] See 2010 PA 383.

[18] See 2010 PA 370. Section 13m did not become effective until July 1, 2011. See 2010 PA 383, enacting § 2 (tie-barring the effective date of Section 13m to the July 1, 2011 effective date of 2010 SB 1037/2010 PA 370).

unemployment tax rates for PEOs and their client employers. In 2011, Section 13m provided, in relevant part:

(2) . . . [A] PEO that is a liable employer shall use the following method for reporting wages and paying unemployment contributions under this act:

(a) The PEO shall comply with all requirements of this act that apply to a contributing employer. . . .

(*i*) For a client employer that is a contributing employer and was a client employer of the PEO on the date that the PEO changed to the reporting method provided in this subdivision, the following rates apply:

(A) Except as provided in sub-subparagraphs (B) and (C),[19] if the client employer reported no employees or no payroll to the agency for 8 or more quarters, the client employer's unemployment tax rate will be the new employer tax rate.

(B) If the client employer was a client employer of the PEO for less than 8 full calendar quarters, the client employer's unemployment tax rate will be based on the client employer's prior account and experience.

* * *

(*ii*) A business entity that is a contributing employer and becomes a client employer of the PEO on or after January 1, 2011 shall retain its existing unemployment tax rate or establish a new rate as provided in section 19.[20]

Section 13m was amended for the first time on December 19, 2011, less than a year after it was first enacted, along with 28 other sections of the MESA (the 2011

---

[19] The exception set forth in Sub-subparagraph (C) is not at issue in this case.

[20] See 2010 PA 383.

6

Amendments).[21]   Of relevance here is that the 2011 Amendments changed both occurrences of "8" in Section 13m to "12."[22]

Then, just six months later in 2012, Section 13m was amended for the second and final time (the 2012 Amendment).[23]  The 2012 Amendment made four changes to Section 13m(2)(a)(*i*) and one change to Section 13m(2)(a)(*ii*).  As to Section 13m(2)(a)(*i*), both occurrences of "12" were changed back to "8"; the clause "or, beginning January 1, 2014, for 12 or more calendar quarters" was added to Section 13m(2)(a)(*i*)(A); the clause "or, beginning January 1, 2014, for less than 12 calendar quarters" was added to Section 13m(2)(a)(*i*)(B); and "quarters" was modified by "calendar" in Section 13m(2)(a)(*i*)(A). As to Section 13m(2)(a)(*ii*), "2011" was changed to "2014."

Section 13m now provides, in relevant part:

> (2) . . . [A] PEO that is a liable employer shall use the following method for reporting wages and paying unemployment contributions under this act:
>
> (a) The PEO shall comply with all requirements of this act that apply to a contributing employer. . . .
>
> (*i*) For a client employer that is a contributing employer and was a client employer of the PEO on the date that the PEO changed to the reporting method provided in this subdivision, the following rates apply:

---

[21] 2011 PA 269, effective December 19, 2011.

[22] See *id*.  And, as will be relevant later in our analysis, the 2011 Amendments also changed the "8" in Section 19—"or at the conclusion of 8 or more consecutive calendar quarters"— to "12."  *Id*.

[23] 2012 PA 219, effective June 28, 2012.

(A) Except as provided in sub-subparagraphs (B) and (C),[24] if the client employer reported no employees or no payroll to the agency for 8 or more calendar quarters or, beginning January 1, 2014, for 12 or more calendar quarters, the client employer's unemployment tax rate will be the new employer tax rate.

(B) If the client employer was a client employer of the PEO for less than 8 calendar quarters or, beginning January 1, 2014, for less than 12 calendar quarters, the client employer's unemployment tax rate will be based on the client employer's prior account and experience.

\* \* \*

(*ii*) A business entity that is a contributing employer and becomes a client employer of the PEO on or after January 1, 2014 shall retain its existing unemployment tax rate or establish a new rate as provided in section 19.

(b) A PEO that is a liable employer and that was operating in this state before January 1, 2011 may elect and use the reporting method in subdivision (a) before January 1, 2014, but shall report using the method in subdivision (a) on and after January 1, 2014.[25]

Finally, MCL 421.19(a)(1)(*i*) provides, in relevant part:

(a) The commission shall determine the contribution rate of each contributing employer for each calendar year after 1977 as follows:

(1)(*i*) . . . If . . . at the conclusion of 12 or more consecutive calendar quarters during which the employer has not had workers in covered employment, and if the employer again becomes liable for contributions, the employer shall be considered as newly liable for contributions for the purposes of the tables in this subsection.[26]

---

[24] As noted earlier, the exception set forth in Sub-subparagraph (C) is not at issue in this case.

[25] MCL 421.13m(2).

[26] MCL 421.19(a)(1)(*i*).

## III. BASIC FACTS AND PROCEDURAL HISTORY

Several key facts are undisputed. First, Great Oaks became a client employer of a PEO that operated in this state before January 1, 2011.[27] For that reason, it was not required to change its reporting method until January 1, 2014.[28] Second, Great Oaks had been a client employer of the PEO for at least 8 quarters as of January 1, 2014, and Great Oaks had reported no employees or payroll for those same 8 quarters.[29] Third and finally, Great Oaks's PEO did not change its reporting method until January 1, 2014.[30]

The dispute began when the Agency concluded that Great Oaks, which had 8 quarters of not reporting employees or payroll by January 1, 2014, was *not* entitled to the new-employer tax rate beginning with tax year 2014 because it did not *report* its eighth nonreporting quarter until after January 1, 2014.[31] The Agency reasoned that client employers were only eligible for the new-employer tax rate if they reported no employees or payroll "beginning January 1, 2014, for 12 or more calendar quarters . . . ." Great Oaks

---

[27] See *Unemployment Ins Agency v Great Oaks Country Club, Inc*, MAHS Decision & Order (Case No. 4872482), issued April 7, 2016, p 2 (ALJ Decision).

[28] MCL 421.13m(2)(b).

[29] See ALJ Decision, p 2.

[30] See *id*.

[31] See ALJ Decision, p 2. Great Oaks points out that the Agency's position on the proper meaning of Section 13m was different in the proceedings prior to its appeal in the Court of Appeals. See Defendant's Supplemental Reply Brief on Appeal (August 19, 2020) at 5-6. In this appeal, however, we deal exclusively with the Agency's conversion-date argument, as that was the one that it made in this Court.

protested the Agency's decision.[32]  Great Oaks argued that the Agency's interpretation overlooked the 8-quarter safe-harbor lookback period of Section 13m, and it asserted that it was entitled to the new-employer tax rate because it "reported no employees or [no] payroll to the [A]gency for 8 [or more] calendar quarters prior to January 1, 2014."[33]

After the Agency rejected its protests, Great Oaks appealed to an administrative law judge (ALJ).  The ALJ determined that because Great Oaks had 8 quarters of no employment or payroll before January 1, 2014, it was entitled to the new-employer tax rate.[34]  The ALJ ruled that the phrase "beginning January 1, 2014" in Section 13m is the date by when a client employer must have accrued 8 quarters of not reporting employees or payroll, rejecting the Agency's reading that "beginning January 1, 2014" is the date that triggered the increase of the number of nonreporting quarters from 8 to 12.[35]

A three-member panel of the Michigan Compensation Appellate Commission (the MCAC) affirmed the ALJ's ruling.[36]  The Oakland Circuit Court did likewise.

The Agency subsequently appealed as on leave granted in the Court of Appeals, which held in the Agency's favor.[37]  The Court of Appeals reversed the circuit court and

---

[32] See ALJ Decision, p 2.

[33] *Id*.

[34] See *id*. at 5-6.

[35] See *id*.

[36] *In re Great Oaks Country Club, Inc*, 2017 Mich ACO 1852.

[37] See *Ambs Message Ctr*, 329 Mich App at 589-593.  This case was consolidated along with two others in the Court of Appeals.  See *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Ambs Message Ctr, Inc* (Supreme Court Docket No.

vacated its order—along with the MCAC's decision and the ALJ's ruling—and remanded the case to the ALJ for entry of a decision upholding the Agency's tax determination for the relevant tax years.[38] The Court of Appeals reasoned that because the claimants' PEOs "waited until January 1, 2014, to change their reporting method, the longer lookback period applied to each claimant, and the claimants were not entitled to the new-employer tax rate unless they had not reported payroll or employees for 12 quarters by January 1, 2014."[39]

This appeal followed. In lieu of granting leave, we ordered oral argument on the application, directing the parties to address whether Great Oaks could "satisfy MCL 421.13m(2)(a)(*i*)(A) by reporting no employees or no payroll for the eight quarters before January 1, 2014."[40]

## IV. STANDARD OF REVIEW AND INTERPRETIVE PRINCIPLES

A question of statutory interpretation is a question of law that this Court reviews de novo.[41] "The primary goal of statutory interpretation is to 'ascertain the legislative intent

---

160635; Court of Appeals Docket No. 343521); *Dep't of Talent & Economic Dev/Unemployment Ins Agency v NBC Truck Equip, Inc* (Supreme Court Docket No. 160636; Court of Appeals Docket No. 343989). We ordered oral argument only on Great Oaks's application for leave to appeal. See *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Great Oaks Country Club, Inc*, 505 Mich 1056 (2020). The other two cases were held in abeyance pending a decision in this case. *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Ambs Message Ctr, Inc*, 942 NW2d 37 (2020).

[38] *Ambs Message Ctr*, 329 Mich App at 593.

[39] *Id*.

[40] *Great Oaks Country Club, Inc*, 505 Mich at 1056.

[41] *Wigfall v Detroit*, 504 Mich 330, 337; 934 NW2d 760 (2019).

11

that may reasonably be inferred from the statutory language.' "[42]  Courts "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' "[43]  " 'The first step in that determination is to review the language of the statute itself.' "[44]  "Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used."[45]  A statute's history—"the narrative of the 'statutes repealed or amended by the statute under consideration'—properly 'form[s] part of [its] context . . . .' "[46]  When statutory language is unambiguous, no further judicial construction is required or permitted because the Legislature is presumed to have intended the meaning it plainly expressed.[47]

---

[42] *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011), quoting *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 526; 697 NW2d 895 (2005).

[43] *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

[44] *Krohn*, 490 Mich at 156, quoting *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999).

[45] *Krohn*, 490 Mich at 156 (citations omitted).

[46] *People v Pinkney*, 501 Mich 259, 276 n 41; 912 NW2d 535 (2018), quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 256.  See also *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009) ("[C]ourts must pay particular attention to statutory amendments, because a change in statutory language is presumed to reflect either a legislative change in the meaning of the statute itself or a desire to clarify the correct interpretation of the original statute.").

[47] *Pinkney*, 501 Mich at 268.  See also *2 Crooked Creek, LLC v Cass Co Treasurer*, 507 Mich ___, ___; ___ NW2d ___ (2021) (Docket No. 159856); slip op at 7 ("When the statutory language is clear and unambiguous, judicial construction is not permitted and the statute is enforced as written.") (quotation marks and citation omitted).

# V. ANALYSIS

To determine whether "beginning January 1, 2014" is better understood by the conversion-date interpretation preferred by the Agency and accepted by the Court of Appeals or by the accrual-date interpretation preferred by Great Oaks and accepted by the three lower tribunals, we apply the plain meaning of Section 13m in context—which means that we consider both the statutory scheme in which Section 13m is situated and whatever amendments were made to it since its enactment.

Section 13m(2)(a)(*i*) establishes two prerequisites for determining a client employer's tax rate. If a client employer "is a contributing employer" and "was a client employer of the PEO on the date that the PEO changed to the reporting method provided in this subdivision," then it is appropriate to move to Section 13m(2)(a)(*i*)(A) and (B). Both prerequisites of Section 13m(2)(a)(*i*) are satisfied here. Great Oaks is a contributing employer to the unemployment-compensation fund managed by the Agency, and the ALJ determined that Great Oaks was a client employer of its PEO on the date its PEO changed to client-level reporting, i.e., January 1, 2014.

Section 13m(2)(a)(*i*)(A) refers to some number of "calendar quarters"—8 or 12— in which "the client employer reported no employees or no payroll to the agency . . . ." Crucially, nowhere does it speak of a reporting *method* the way that Section 13m(2)(b) does. Since 2011 when it was enacted, Section 13m(2)(b) has always provided that a PEO that was operating in the state of Michigan before January 1, 2011, "may elect and use the reporting *method* in subdivision (a) before January 1, 2014," but that it "shall report using

13

the *method* in subdivision (a) on and after January 1, 2014."[48] That "reporting method in subdivision (a)" is client-level reporting. Thus, when Section 13m(2)(a)(*i*)(A) is read alongside Section 13m(2)(b), giving effect to each, it becomes clear that "beginning January 1, 2014" in Section 13m refers to the date by when *a certain number of nonreporting quarters must have been accrued*, not to the date by when *the switch to the method of client-level reporting occurred.* If the Legislature had wanted Section 13m(2)(a)(*i*)(A) to govern the assessment of a certain tax rate for client employers based on when they switched to the *method* of client-level reporting, it could have included language to that effect in Section 13m(2)(a)(*i*)(A). But it did not. Instead, it provided only for the assessment of a certain tax rate to client employers based on a certain *number* of nonreporting quarters accrued by a certain date, namely, January 1, 2014.

Similarly, Section 13m(2)(a)(*i*)(B) also refers only to some *number* of quarters, not a reporting *method*, vis-à-vis the appropriate tax rate to be assessed to client employers. As with Section 13m(2)(a)(*i*)(A), in Section 13m(2)(a)(*i*)(B), "January 1, 2014" functions as a cut-off date. Reading the subsections together, Section 13m(2)(a)(*i*)(A) delineates under what circumstances a client employer like Great Oaks is entitled to the new-employer tax rate.[49] Section 13m(2)(a)(*i*)(B) then fills in the rest of the picture, clarifying that a client employer is to be assessed an experienced-employer tax rate "[i]f the client employer was

---

[48] MCL 421.13m(2)(b) (emphasis added).

[49] A client employer is entitled to the new-employer tax rate when it has accrued 8 nonreporting quarters before January 1, 2014 (or 12 nonreporting quarters after January 1, 2014).

14

a client employer of the PEO for *less than* 8 calendar quarters or, beginning January 1, 2014, for *less than* 12 calendar quarters . . . ."[50] Thus, prior to January 1, 2014, when a client employer had fewer than 8 calendar quarters as a client employer of a PEO, the client employer was assessed the experienced-employer tax rate, and after January 1, 2014, when a client employer has fewer than 12 calendar quarters as a client employer of a PEO, the client employer is assessed the experienced-employer tax rate. As with Section 13m(2)(a)(*i*)(A), Section 13m(2)(a)(*i*)(B) does not speak of a reporting *method*. Rather, Section 13m(2)(a)(*i*)(B) speaks of a certain *number* of quarters in which the client employer was in a relationship with its PEO, with January 1, 2014, serving as the cut-off date for the relevant number of quarters needed for the experienced-employer tax rate to be assessed.

In sum, for Section 13m(2)(a)(*i*)(A) to mean what the Agency contends it means, it would have to say something about a reporting method, not just that not reporting employees or payroll must occur for a certain number of quarters "beginning January 1, 2014." And for Section 13m(2)(a)(*i*)(B) to mean what the Agency contends it means, it likewise would need to say something about a reporting method, not just that a relationship between a client employer and its PEO for a certain number of quarters corresponds to a certain tax rate.

Further, the amendments to Section 13m that were made in 2011 and 2012—which changed "8" to "12" and then restored "8," all within 18 months of the enactment of Section 13m—indicate that the purpose of the 2012 Amendment was remedial, intended to undo the 2011 Amendments' erasure of the 8-quarter safe-harbor condition so that client

---

[50] MCL 421.13m(2)(a)(*i*)(B) (emphasis added).

15

employers like Great Oaks under the facts of the instant case would receive the new-employer tax rate under Section 13m. Prior to the 2012 Amendment, there was no cut-off date in Section 13m. The purpose of including the clause "or, beginning January 1, 2014, for 12 or more calendar quarters" in Section 13m(2)(a)(*i*)(A) and the clause "or, beginning January 1, 2014, for less than 12 calendar quarters" in Section 13m(2)(a)(*i*)(B) was to mandate that, beginning January 1, 2014, client employers who used a PEO were required to have 12 nonreporting quarters to be eligible for the new-employer tax rate; otherwise, they would be assessed the experienced-employer tax rate. That the 8-quarter nonreporting condition remains in Section 13m (after it was restored by the 2012 Amendment) indicates that the original, 2011 version of Section 13m has been carried forward to the present.

In sum, the 2011 version of Section 13m provided that 8 or more nonreporting quarters were sufficient for the client employer to be assessed the new-employer tax rate and that fewer than 8 such quarters in a relationship with a PEO would mean that the client employer would be assessed the experienced-employer tax rate. Simply put, Section 13m preserves that requirement but also provides that after January 1, 2014, 12 nonreporting quarters are required.

We turn now to the Court of Appeals' conclusion that Great Oaks's interpretation of Section 13m—that "beginning January 1, 2014" means " 'as of January 1, 2014' "—is "untenable because it renders portions of the statutory scheme nugatory," specifically, Section 19.[51] We are not persuaded.

The Court of Appeals reasoned as follows:

---

[51] *Ambs Message Ctr*, 329 Mich App at 591.

16

Under MCL 421.19(a)(1)(*i*), any employer—whether a client employer represented by a professional employer organization or a self-reporting employer—that has not had workers in covered employment for 12 or more consecutive calendar quarters is treated as a new employer if it should again become liable for contributions. Therefore, there was no reason for the Legislature to provide that, beginning January 1, 2014, any client employer who has had no employees or payroll for 12 quarters would qualify as a new employer.[52]

This is incorrect because the Court of Appeals failed to account for the exclusive, mandatory nature of Section 13m. In fact, it is the Court of Appeals' interpretation of Section 13m and Section 19 that renders Section 19 nugatory, not Great Oaks's interpretation.

Section 13m(2)(a) states, in relevant part, that "a PEO that is a liable employer *shall* use the following method for reporting wages and paying unemployment contributions under this act: (a) The PEO *shall* comply with all requirements of this act that apply to a contributing employer."[53] The foregoing language is mandatory; therefore, Section 13m exclusively governs reporting payroll, calculating rates, and paying contributions for a client employer employing a PEO, which is what Great Oaks did with its PEO for the 8 quarters prior to January 1, 2014. And because Section 13m applies exclusively to client employers using PEOs, our interpretation cannot be said to render Section 19 nugatory, given that each provision applies to different factual circumstances. The insertion of the clause "or, beginning January 1, 2014, for 12 or more calendar quarters" placed PEOs governed by Section 13m on even footing with the 12-quarter scheme in place for all other

---

[52] *Id.*

[53] MCL 421.13m(2)(a) (emphasis added).

17

employers governed by Section 19 after the transition period—i.e., the time prior to January 1, 2014—concluded. The statutory history of Section 19 supports this reading. The 2011 Amendments changed the "8" in Section 19—"or at the conclusion of 8 or more consecutive calendar quarters"—to "12."[54] This indicates that Section 19, which was amended at the same time as Section 13m,[55] was amended in that way to bring the standards governing non-PEO-using employers subject to Section 19 into conformity with those standards governing PEO-using client employers subject to Section 13m. Our interpretation therefore does not render Section 19 nugatory. Instead, our interpretation properly gives effect both to Section 19 and to Section 13m.

Moreover, if, as the Court of Appeals reasoned, Section 19(a)(1)(*i*) governs *all* employers and provides that those that do not report employees or payroll for 12 consecutive calendar quarters are to be assessed a new-employer rate, then the same would apply to PEOs governed by Section 13m. But if that is the case, then there is no reason for the Legislature to have included the 12-quarter clause in Section 13m because the 12-quarter nonreporting condition is already addressed in Section 19. Thus, it is the Court of Appeals that interprets the statutory provisions in a manner that renders Section 19 nugatory, not Great Oaks.

In sum, because Great Oaks used a PEO—meaning it is governed by Section 13m, not Section 19(a)(1)(*i*)—and "reported no employees or no payroll to the agency" for 8 quarters prior to January 1, 2014, it should be assessed the new-employer tax rate.

---

[54] See 2011 PA 269, effective December 19, 2011.

[55] *Id*.

18

Finally, the Agency's conversion-date interpretation of Section 13m is contrary to the most reasonable, commonsense understanding of the operation of specific language in Section 13m, namely, the phrase "calendar quarters." To understand why this is so, it is helpful first to have some background about the mechanics of filing quarterly wage reports.

The MESA's unemployment-insurance taxation scheme requires employers to file reports on a "calendar quarterly" basis. In any given year, the first quarter runs from January 1 to March 31; the second quarter runs from April 1 to June 30; the third quarter runs from July 1 to September 30; and the fourth quarter runs from October 1 to December 31. Payroll taxes are calculated and reported in arrears based on calendar quarterly reports for those quarterly periods. Pursuant to the Michigan Administrative Code, Rule 421.121(2), quarterly reports are due to be filed 25 days *after* the end of the quarter being reported.[56]

Under the Agency's conversion-date interpretation, to be eligible for the new-employer tax rate with only 8 nonreporting quarters, Great Oaks needed to have converted to client-level reporting by, at most, 25 days after the end of the *third* quarter of 2013 (which ended September 30), *not* the *fourth* quarter of 2013 (which ended December 31). That is because waiting until the final quarter of 2013 to convert to client-level reporting means that a quarterly wage report would not be filed until, at most, 25 days *after* January 1, 2014, thereby rendering Great Oaks's switch to client-level reporting effective January 1, 2014. In other words, the switch must occur a quarter "early" for it to be effective prior to

---

[56] "[A]n employer shall submit a quarterly report . . . on or before the twenty-fifth day of the month next following the last day of the calendar quarter . . . for which the report is submitted." Mich Admin Code, R 421.121(2).

January 1, 2014. And because, here, the switch to client-level reporting was effective on January 1, 2014, the moment Great Oaks completed its eighth quarter of not reporting employees or payroll on that date, it was also at that very same moment rendered ineligible to receive the new-employer tax rate because it was suddenly required to have completed 12 quarters of not reporting employees or payroll.

The conversion-date interpretation, in other words, renders nonsensical the logic of the quarterly reporting system established by the MESA. If reports are due to be filed, at most, 25 days after the end of a calendar quarter, then it cannot be the case that Great Oaks was required to have converted to client-level reporting after the third quarter of 2013 rather than after the fourth quarter of 2013. The concept and practice of quarterly reporting permit Great Oaks to make use of the final quarter of 2013 to meet its obligations under Section 13m and then file its reports, at most, 25 days after the end of the quarter. Punishing Great Oaks for doing just that renders null the logic and practice of calendar quarterly reporting, and we decline to read Section 13m to require something so opposed to common sense.[57]

In sum, the conversion-date interpretation imposes an impossible-to-meet and textually unstated rule; under it, Great Oaks simultaneously meets and fails to meet the standard to be assessed the new-employer tax rate under Section 13m.

---

[57] The Agency overlooks the fact that Section 13m was enacted by the Legislature as a safe harbor, intended to help client employers adjust to the new financial burden posed by client-level reporting. If this Court were to accept the Agency's understanding of calendar quarterly reporting, businesses that follow a traditional quarterly calendar would be precluded from taking advantage of the 8-quarter safe-harbor provision, contrary to the Legislature's desire in enacting it.

20

## VI. CONCLUSION

For the reasons set forth in this opinion, we reverse the Court of Appeals and remand to the Agency for entry of a decision assessing Great Oaks the new-employer tax rate under Section 13m because it reported no employees or payroll for the 8 quarters prior to January 1, 2014.

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch